**Michael MULLHOLLAND, et al., Plaintiffs,**

v.

**DEPARTMENT OF the ARMY, et al., Defendants.**

Civ. A. No. 87–0317–A.

United States District Court, E.D. Virginia, Alexandria Division.

May 28, 1987.

Kevin P. Zeese, James B. Adelman, Zwerling, Mark, Ginsberg & Lieberman, P.C., Alexandria, Va., for plaintiffs.

Henry E. Hudson, U.S. Atty., E.D.Va., Alexandria, Va., Robert J. Cynkar, Deputy Asst. Atty. Gen., Richard Greenberg and Jeffrey S. Paulsen, Trial Attys., Dept. of Justice, Captain Richard Hatch, Office of the Judge Advocate Gen., Dept. of Army, Washington, D.C., for defendants.

MEMORANDUM OPINION

HILTON, District Judge.

This case is before the Court on defendants' motion for summary judgment pursu-

---

ant to Rule 56 of the Federal Rules of Civil Procedure.

On April 8, 1985, the Department of Defense established the Civilian Employee Drug Abuse Testing Program. The purpose of the program was to assist in determining fitness for appointment or assignment to, or retention in, a critical job; to identify drug abusers and notify them of the availability of appropriate counseling, referral, rehabilitation, or other medical treatment, and to assist in maintaining the national security and the internal security of the Department of Defense. The program is designed to identify persons whose drug abuse could cause disruption of operations, destruction of property, threats to the safety of themselves and others, or the potential for unwarranted disclosure of classified information through drug-related blackmail.

The Directive designates selected critical positions subject to urinalysis testing as involving law enforcement, national security, aviation jobs, air traffic controllers, armed guards, handlers of toxic chemical and nuclear materials, and drug testing personnel. The Directive requires that applicants for critical jobs and incumbent employees in critical jobs be screened for drug abuse. Drug screening for employees in these positions is regarded as a condition of employment, and is implemented by requiring that both applicants and current employees sign DA Form 5019–R, which recognizes the Army's right to require the applicant or employee to submit to urinalysis. Employees must be notified at least 90 days in advance of the implementation of a drug testing program.[1]

The director of the urine test identifies as appropriate, the work group to be tested. An alcohol and drug coordinator, unit urine test program monitor, or other responsible person is assigned to coordinate urine collection. The urinalysis coordinator ascertains that correctly prepared specimen bottles are used, that each bottle has an affixed gummed label on which the date, service member's social security number, specimen number, and any extra identify-

ing information required by each Military Department shall be recorded. This coordinator must keep a ledger recording the above data and the service member's name and designated observer's name. The service member providing the sample shall initial the label on the bottle and sign the corresponding ledger entry. The coordinator shall see that the subject presents proof of identity, that each sample is collected by the direct observation of a named person of the same gender as the service member proffering the sample, that an adequate volume of urine is collected, and that the observer initials the label on the bottle as verification of receipt and annotates proper chain of custody documents.

The observer must make certain that the sample is not adulterated or changed in any way and shall sign the ledger entry for this sample. He or she shall ensure that the service member gives the sample directly to the coordinator unless the Military Department concerned authorizes the observer to take the specimen from the subject and provide it to the coordinator. If the sample is obtained by the observer before it is proffered to the coordinator, the observer shall complete proper chain of custody recordation. All samples will normally be analyzed by a certified laboratory. If the sample is field tested, the urinalysis coordinator shall ensure that the proper chain of custody recordation is completed. Additionally, the urinalysis coordinator shall ascertain that samples are shipped in securely sealed specimen boxes or padded mailers, that each container is signed and dated across the tape sealing the top and bottom, that proper chain of custody documentation is affixed to each sealed container, and that an outer mailing wrapper is put around every sealed holder. Containers shall be shipped promptly in accordance with ASD(HA) procedures. Those workers who choose not to submit to urinalysis may request reassignment to noncritical positions. If there are no noncritical jobs available at the same grade and pay rate for which an employee is qualified, he or she

---

**1.** Plaintiffs in this case have had over eight    months notice.

may have to accept a job in a lower grade or separate from the federal service.

The selection of test subjects to furnish a urine specimen is made "on the basis of neutral criteria", such as the last digit of a social security number, with no discretion left to the supervisor or commanding officer. Civilian employees proffer their samples from a private closed stall. A monitor is present in the lavatory to listen for normal sounds of urination, to guard against tampered samples, and to ascertain accurate chain of custody.

To ensure that the subject cannot contaminate a previously used container, all personal belongings remain outside the restroom, sleeves are rolled up, and a visual check made of all potential hiding places in the stall or collecting area prior to giving the subject a collection bottle. When the bottle is returned to the monitor, he or she will verify the normal warmth and appearance of the specimen. If at any time during the testing procedure the monitor has reason to believe or suspect that an employee/applicant is tampering with the sample, he or she should stop the procedure and inform the test coordinator who will then determine if direct observation is required. If there is any evidence of misconduct, a formal report should be made to the supervisor so that action in coordination with the civilian personnel office as outlined in paragraph 5–14c(5) of AR 600–85 may be taken.

Most urine samples, except those which are field tested as described above, will be sent directly to a certified Army laboratory for immediate analysis. The laboratory has been accurate in thousands of samples for the Army over the last several years.

If an employee yields a confirmed positive result or exercises his option not to provide a specimen, the employee will be offered counseling or treatment through the local assistance program. An employee with a confirmed positive test result will not automatically be removed from federal service but will be reassigned to an available noncritical position with no loss of pay or benefits. If no noncritical positions are available at the same grade level, the employee will be offered a position at a lower grade if such a position is available. Only if no noncritical positions are available will the employee be separated for failure to meet a condition of employment.

On August 1, 1986, implementation of a civilian drug testing program at Davison Army Airfield at Fort Belvoir, Virginia, was announced. This program authorized random urine testing for drug metabolites among all employees holding critical positions, such as aviation-related jobs, without a search warrant and based on no individualized suspicion or probable cause. Approximately 50 aviation-related positions are covered by the testing program at Davison Airfield. Any use of illegal drugs by employees in these critical positions would pose a severe safety threat to users of the 35 helicopters maintained at this locality. The duties of aircraft mechanics necessitate concentration, judgment, alertness, and skill, and these employees are expected to work with minimal supervision. In executing their job duties, mechanics must pay meticulous attention to detail. This fleet of helicopters is used to transport White House personnel, high level Department of Defense personnel, and members of Congress. These helicopters are also to be used in the event of an emergency evacuation of key national leaders. They regularly fly in the congested flight patterns around Washington, D.C.

Similarly, the responsibilities of aircraft attendants are exceedingly vital and dangerous. These employees refuel the aircraft with minimal supervision, especially on the night shift. They drive tanker trucks with up to 5,500 gallons of highly explosive fuel around moving aircraft and across active runways and ascertain that the fuel is not contaminated. A failure to precisely test the fuel could cause an aircraft to crash.

Numerous studies have shown that illegal drug use is common in the federal workforce and is a cause for grave concern. Since the implementation of the Army's civilian drug testing program in June, 1986, 16 aviation-related employees have had confirmed positive civilian results

Armywide. There have been at least six confirmed cases of drug use among Davison Airfield employees in the past two years, and at least one of the Commanders at Davison Airfield is aware of a "general substance abuse problem" among the employees he supervises. The dilemma is expected to escalate as retirements and other job turnovers bring about the hiring of younger, less experienced workers.

Recent cases have been decided dealing with similar testing policies and must be considered. In the case of *Shoemaker v. Handel*, 795 F.2d 1136 (3rd Cir.1986), the Third Circuit considered the warrantless administrative search exception applied to breath and urine testing of employees in the heavily regulated horse racing industry. The Court concluded that daily random selection of jockeys to be subjected to urine testing was reasonable and did not violate the Fourth Amendment. The Court reasoned that when jockeys opted to work in this "pervasively-regulated" business and accepted a state license, they did so with the knowledge that the New Jersey Racing Commission would utilize its authority to assure public confidence in the integrity of the sport. The strong interest of the state and the pervasive regulation of the industry lessened the justifiable privacy expectation of the subject of the search.

In *McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987), the Iowa Department of Corrections' policy subjected prison guards to drug-related urine, blood, or breath searches of their vehicles and persons upon Department officials' request. After determining that urinalysis is a Fourth Amendment search and seizure, the Court of Appeals balanced the state's need to search against its obtrusiveness into the employees' privacy expectations. The Court found that the corrections officials had a strong need to ascertain that prison guards are not working while under the influence of drugs, that these workers must be alert at all times, and that drug use by a correction officer is some positive indication that such officer may bring drugs into the prison for the inmates. The Court recognized that properly administered urinalysis is not as intrusive as a strip search or a blood

test, that prison guards' privacy expectations, already diminished, are lessened and that officials have a legitimate interest in ensuring that correction officers who come into daily contact with inmates are not inhibited by drugs and are fully able to perform their duties. The Court further held that urinalysis may be conducted uniformly or randomly as long as employee selection is not arbitrary or capricious.

Closely on point with the present case is *National Treasury Employees Union v. von Raab*, 816 F.2d 170 (5th Cir.1987), *rev'g*, 649 F.Supp. 380 (E.D.La.1986). Pursuant to a July, 1986, Directive by its Commissioner, the United States Customs Service implemented a urinalysis drug screening program for applicants tentatively chosen for certain positions and persons seeking a transfer to a covered position.

At the test site, an observer gives the employee a form on which he may list any medications he has taken or any other legitimate reasons for his having been in contact with potentially illegal drugs in the preceding 30 days. This form is kept in a sealed envelope that will not be opened unless the urine test is positive.

The procedure requires an employee to relinquish his personal belongings and disrobe; the observer gives the employee a bottle for the sample. The employee produces the urine specimen inside a restroom stall. To deter tampering and without visually observing the act of urination, the observer stays in the restroom to listen for normal urination sounds and to collect the specimen immediately upon the employee's leaving the stall and giving the bottled specimen to the observer. To make certain that a previously collected sample has not been presented, the observer is instructed to reject an unusually hot or cold specimen. The Customs Service adheres to rigid chain of custody procedures after collection.

The Fifth Circuit reasoned that illicit drug use undermines the integrity of the Service (profession). Illegal drugs are extremely expensive, drug users may be especially susceptible to bribes by smugglers. The Court noted that in order to carry out

its governmental function as an employer, the government may require from its employees what it may not require of others. That government employees may be subject to searches or other liberty restraints that would be impermissible absent the employment relationship as long as these requirements are directed reasonably at assuring integrity and competence. That work-related searches that "are mostly incident to the primary business of (an) agency" may comply with the Fourth Amendment's reasonableness requirements.

Turning to the case at hand, urinalysis testing is a search and seizure within the meaning of the Fourth Amendment. Having determined that urinalysis testing is a Fourth Amendment search, the Court must balance the social and governmental need for the testing against the risk that the search will undermine the social order by unreasonably invading personal privacy rights. *Bell, et al. v. Wolfish, et al.*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). The Court must examine the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place where it occurs. Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure ... the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976).

Determination of Fourth Amendment reasonableness necessitates consideration of the totality of circumstances in each case, weighing all of the factors indicating constitutional violation against all others showing validity. The scope and manner, location, availability of less intrusive measures, justification and effectiveness must be considered as to the obtrusiveness of the search.

In this case, the observer does not watch the subject while the sample is being produced. The sample is produced in the privacy of a restroom stall. A restroom is the most private area practicable to conduct the drug testing. Those tested are selected by a random method, leaving no discretion to a supervisor. While tests are random as to an individual tested at any time, all employees know the full procedures and that they will be tested in this random manner.

The test is required only from employees/applicants who currently hold, or are applying for, sensitive positions and are aware in advance of the urine test mandate. The only possible adverse results following a confirmed positive urinalysis test or application withdrawal prior to testing are reassignment to an available, noncritical position for which the subject is qualified with no loss of pay or benefits; if no such noncritical positions are available, an employee/applicant will be offered a position at a lower grade level if such a position is available. Only if no noncritical positions are available will the employee be separated for failure to meet a condition of employment. Only employees who test positive are prone to removal from the sensitive aviation-related position.

In considering the availability of less intrusive measures, in this case the alternative information sources do not eradicate the need for urine testing. Even though the Army in some cases has had the chance to observe the performance of employees while they were working in critical positions, this provides little basis on which to assess their illegal drug-free reputation and reliability of applicants for sensitive positions. Although drug testing may not discover some drug users who abstain for a few days prior to the test, a user still exposes himself or herself to the risk that the test would be positive. Also, employees may not always be aware of the diminishing effect of the drug on an individual user. Thus, the risk of detection may thwart drug using employees/applicants from starting or continuing to use illicit drugs.

In balancing the government's strong legitimate interest in preventing drug use among these particular 50 employees at Davison Airfield against these workers' constitutional right to a reasonable expectation of privacy, I find that the Army's

requiring drug testing of these plaintiffs is not an unreasonable search or seizure under the Fourth Amendment. On viewing the critical, safety-related nature of plaintiffs' jobs the random urinalysis testing, where samples are taken in private and tests are performed by a laboratory that has demonstrated repeatedly over the years to be accurate, is fully justified as to these particular employees. The plaintiffs in this case repair, maintain, and service a fleet of 35 helicopters which are used primarily for transporting White House personnel, high level Department of Defense personnel, and members of Congress. These aircraft would be used in emergency evacuation of key national leaders.

Because of the sensitive nature of flight patterns and congestion around the Washington, D.C. area, mechanical reliability of these helicopters is crucial. The duties of aircraft mechanics and refuelers demand continuous concentration, alertness, exacting measurements, and attention to detail with minimal supervision. Considering the prevalence of drug usage in our society and the workplace, and the subtle and perilous present and after effects on the user's physical, mental, and emotional states, it is not only acceptable but imperative that this random urine testing conducted under proper procedures be required for certain sensitive positioned employees such as plaintiffs who are responsible for numerous lives. Recent cases particularly have demonstrated that employees in dangerous and/or highly visible occupations, which involve the safety, well-being, and integrity of the public, are and should be held to a higher standard of care than other less conspicuous, non-safety related positions.

Since these plaintiffs are given advance notice of the urinalysis sampling, defendants' testing program does not violate plaintiffs' Fifth Amendment right to due process. Although plaintiffs allege that drug testing cannot determine whether the drugs were taken on or off the job, off-duty drug use can affect employee performance on the job. Thus, the government has a legitimate interest in detecting and deterring that drug use. Considering all of the significant factors, this Court

concludes that the U.S. Army's program for testing employees/applicants of sensitive aviation positions at Davison Field is not an unreasonable, unduly obtrusive search and seizure within the meaning of the Fourth Amendment. The defendants' motion for summary judgment is granted.

An appropriate Order shall issue.