**Sandra M. THOMSON, et al., Plaintiffs,**

v.

**Caspar W. WEINBERGER, et al., Defendants.**

**Civ. A. No. R–87–393.**

United States District Court,
D. Maryland.

March 28, 1988.

Lawrence S. Greenwald, Dana A. Reed, Baltimore, Md., for plaintiffs.

Jeffrey S. Paulsen, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM

RAMSEY, District Judge.

Plaintiffs are civilian employees of the United States Army at Aberdeen Proving Ground in Aberdeen, Maryland. In this suit, they challenge the constitutionality of a Department of Defense Directive requiring them to undergo random drug urinalysis testing as a prerequisite to maintaining their jobs. On February 27, 1987, at a hearing on plaintiffs' motion for preliminary injunction, the Court concluded that testing not based on reasonable articulable suspicion of drug use violated the Fourth Amendment. Accordingly, the Court granted plaintiffs' motion, enjoining defendants from demanding that these plaintiffs participate in any random testing program.

Today, the Court addresses defendants' renewed motion for summary judgment, in which defendants ask the Court to abandon its previous position, and vacate its preliminary injunction. Plaintiffs have filed their opposition and defendants have replied. Having studied the parties' supporting memoranda, and the opinions of other courts that have addressed this issue, the Court is now prepared to rule without need for oral argument. *See* Local Rule 6 (D.Md.1986).

Plaintiff Thomson is a research biologist with the Army Chemical Research and Development and Engineering Center (CRDEC). She has a surety clearance that allows controlled access to toxic chemicals. Plaintiff Stout is a pipefitter in the Division of Housing and Engineering at Aberdeen. He also has a surety clearance that allows access to secured areas, including those where toxic chemicals are used and stored.

In March, 1986, the Army notified plaintiffs that they, along with other civilians in "critical" jobs [1] at Aberdeen, would be required to submit to random, mandatory urine collection and testing as part of the

---

**1.** The Interim Change defines the following jobs or job classes as "critical:" aviation positions, guard and police positions, chemical and nuclear surety positions, alcohol and drug abuse prevention and control program direct service staff, and all employees at army forensic drug testing laboratories. Beyond these jobs, the interim change outlines procedures to be followed when a local commander wishes to add other jobs to the "critical" list. *See* Appendix K to Interim Change.

Army's Civilian Drug Abuse Testing Program.[2] Under this program, each employee is given an identification number consisting of his social security number and an alphabetic character. Each employee's number is then placed into two separate test pools. From the first pool, 32 numbers are selected each month and then set aside. From the second pool, eight numbers are selected each month and then placed back into the pool. Defendants maintain that this system insures that all employees will be tested at least once and that each employee suffers only a two-percent chance of being tested a second time. *See* Appendix A to CRDEC Draft Regulation (attached to Affidavit of Sandra Thomson).

Once chosen for testing, the individual employee must present and identify himself to the Unit Alcohol and Drug Coordinator. *See* Transcript of Testimony of Carol Abercrombie at Preliminary Injunction Hearing at 56. A test monitor then follows the employee to a bathroom stall and performs a visual inspection of the area and the employee. When entering the area, the employee is required to roll up his sleeves and is not allowed to carry in a coat or bag. *See* CRDEC Draft Regulation. After giving the employee a specimen cup, the monitor permits the employee to close the stall door. The monitor then listens for sounds associated with urination and, after the employee emerges from the stall, checks the resultant specimen to see that it is warm. *See* Testimony of Carol Abercrombie at 46–47, 56–58.

Under the program, all future and current employees must sign a form indicating their consent to the testing. Entitled "Condition of Employment for Certain Civilian Positions Identified as Critical Under the Drug Abuse Testing Program," the form threatens current employees who refuse to sign with reassignment or demotion to a non-critical job or separation from federal employment. The same threats apply to current employees who sign the form but later refuse to submit to the testing. *See* DA Form 5019–R (included in Interim Change).

In support of their renewed motion for summary judgment, defendants point to a string of cases from other Districts and Circuits, in which the emerging trend, according to defendants, is to validate random testing under the Fourth Amendment where the government can make a strong showing that drug use by government employees endangers human safety.[3] Arguing that they have demonstrated just such a threat in this case, defendants ask the Court to follow this supposed trend and validate the Army's program.

This Court recognizes that illegal drug use is a terrible problem in our nation today. Drugs grip the life out of those who are addicted to them, indiscriminately killing members of every race and economic class. When drugs impair the judgment of those charged with critical tasks, everyone suffers. Nonetheless, in assessing the legality of rules designed to control or eliminate this problem, the Court sees no reason to depart from the constitutional principles on which our society has steadfastly relied.[4]

---

**2.** This program was authorized by Department of Defense Directive 1010.9 (April 5, 1985) and implemented by Army Regulation 600–85, Interim Change No. Ill. *See* Exhibits A and B to Defendants' motion to dismiss, or in the alternative, for summary judgment. Between the program's inception at Aberdeen and the preliminary injunction hearing, 634 random tests were conducted and three yielded positive results. *See* Testimony of Carol Abercrombie at 44, 48. Among the 5397 "critical" civilian positions tested nationwide over a six-month period, 37 tests—approximately 0.68%—yielded positive results. *See* Defendants' Exhibit Z–1.

**3.** As an independent ground for their motion, defendants argue that the Army's program does

not violate plaintiffs' rights under the Fifth Amendment to the federal constitution. The Court expresses no opinion on this argument.

**4.** In overturning a mandatory, periodic drug testing program for police officers, Judge Edenfield of the Southern District of Georgia noted similar concerns. He said

[t]he drug problem in this country is real and it is dangerous. But the methods used to eradicate it must be implemented within constitutional limits, not only because the employees to be tested for drugs have an expectation of privacy, but also because the creation of unfortunate precedent in this area, especially in light of the technological advances of

By asking the Court to validate the Army's testing program, defendants would have the Court engage in just such a departure. Without any inquiry into the degree to which a particular employee has or has not displayed the telltale signs of drug use or impairment, the Army's program subjects an entire class of employees to a randomly-timed test of their urine. While our Courts have uniformly recognized that there are some narrow circumstances in which a warrantless search is valid, none has tolerated a search as random and as intrusive as that entailed in this program.

At its hearing on plaintiff's motion for a preliminary injunction, the Court found that plaintiffs had demonstrated a substantial likelihood that the Army's program violated their Fourth Amendment rights. The Court balanced defendants' need to search against the intrusiveness that the search entails,[5] and, adopting Judge Edenfield's reasoning in *American Federation of Government Employees v. Weinberger,* 651 F.Supp. 726 (S.D.Ga.1986), found that defendants' program was so intrusive that it could not be justified by defendants' important but as yet unrealized fears. Without some reasonably articulated suspicion that a particular employee was using drugs at work or that his judgment was then impaired by off-the-job drug use, the Court concluded, defendants could not subject that employee to a drug test.

Since the Court issued this ruling, nothing has happened in the way of changes to the Army's program or other court decisions that would prompt the Court to abandon its position. Defendants have done nothing to minimize the intrusiveness or the randomness of their program. Had the Court not issued its injunction, plaintiffs would have been periodically escorted to a bathroom stall and told to urinate while a monitor listens. Plaintiffs would have been subject to this search on the strength of nothing more than a random selection process. Nor have defendants pointed to any changes in plaintiffs' duties, changes that would somehow skew the Court's previous balancing analysis.[6]

Moreover, the emerging trend that defendants describe in urging the Court to lift its injunction is really no trend at all.[7] Since the Court issued its preliminary injunction, one appellate panel and three district courts have addressed the constitutionality of mandatory random drug testing of federal employees. While two of these courts struck down random testing, the two that upheld it faced factual situations

---

recent years, could and would have a far-reaching impact upon the rights of all citizens in areas outside the drug context.

*American Federation of Government Employees, AFL–CIO v. Weinberger,* 651 F.Supp. 726, 736 (S.D.Georgia 1986), *aff'd sub nom. National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416 (D.D.C.1988).

**5.** The Supreme Court has relied on this balance to determine the reasonableness of a number of different kinds of searches. *See e.g. O'Connor v. Ortega,* —— U.S. ——, 107 S.Ct. 1492, 94 L.Ed.2d 714, 107 S.Ct. 1492 (1987) (search of government employee's office) (plurality opinion); *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (search of public school student's purse); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (pat-down search of defendant's outer clothing).

**6.** Though it has no effect on the Court's opinion, defendants have changed the brand of test they use to analyze their employees' specimens. Formerly, samples were screened initially with the EMIT field test, and only the field-test positive samples were sent to a certified laboratory for confirmation by a gas chromotography/mass spectrometry test. Now, all samples are analyzed by a certified laboratory using this test. *See* Defendants' Exhibit Z. While defendants assert that this change yields more conclusive results, several courts have noted that urinalysis drug testing, whether by the EMIT test or gas chromotography/mass spectrometry, is not capable of determining whether a person is currently impaired or intoxicated by drugs. *See National Federation of Federal Employees v. Carlucci,* 680 F.Supp. at 428 (D.D.C.1988).

**7.** Though defendants' rely on it as the chief case in their trend, *National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) does not involve random drug testing. In *Von Raab,* the individuals sought to be tested were applicants for transfer to sensitive jobs, not current employees. Applicants were not required to submit to tests until they themselves had chosen to apply for a transfer. The tests could hardly be considered random because, as the Court noted, employees were tested "... only as a result of a process that they choose to set in motion." *Id.* at 177.

that differed significantly from the facts presented here.

In *Mulholland v. Department of the Army*, 660 F.Supp. 1565 (E.D.Va.1987) (Hilton, J.), one of the cases to uphold testing, the individuals sought to be tested were 50 unsupervised aircraft maintenance and service personnel who serviced a fleet of helicopters used primarily to transport White House personnel, high level Department of Defense personnel, and members of Congress. In reaching its result, the Court relied on the employees' direct role in the nation's security, the lack of supervision, and evidence of a widespread drug problem at the airfield. *Id.* at 1567–68; 1569–70.

In *American Federation of Government Employees, AFL–CIO v. Dole*, 670 F.Supp. 445 (D.D.C.1987), the other case to uphold random testing, the Court was constrained to reach its result by the procedural posture of the case. Plaintiff, a union of Department of Transportation employees in aviation-related and "top secret" security clearance jobs, had moved for a preliminary injunction enjoining the Department from subjecting its members to random drug testing. Concurrently, the Department moved for summary judgment. In denying the preliminary injunction and granting the Department's motion, the Court rested its decision not so much on the merit of the Department's testing program as on plaintiff's failure to provide sufficient evidentiary support for its claim.

The Court invited plaintiff to pursue its claim after the record was complete, and ordered the Department to facilitate development of the record by maintaining accurate logs of its test results and any resultant personnel actions. *Id.* at 449.

Against these two inconclusive cases, the Court notes two other cases specifically holding that mandatory testing in the absence of reasonable articulable suspicion is unconstitutional.[8] In *Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575 (9th Cir.1988) (WESTLAW, Allfeds library, CTA file), a railway employees' union challenged the constitutionality of Federal Railroad Administration regulations requiring railway employees to submit to alcohol and drug testing after train accidents. In finding the regulations unconstitutional, the Court noted that "[a]ccidents, incidents or rule violations, by themselves, do not create reasonable grounds for suspecting that tests will demonstrate alcohol or drug impairment in any one railroad employee, much less an entire train crew." *Id.* at 587. Without some degree of individualized suspicion, the tests simply did not comport with the Fourth Amendment's requirements, the Court concluded. *Id.* at 588.

In *National Federation of Federal Employees v. Carlucci*, 680 F.Supp. 416 (D.D.C.1988) [hereinafter "*NFFE*"], two unions challenged the same Army drug testing program that is the focus of this case.[9]

---

**8.** At least five courts have reached the same conclusion in considering drug testing for state or county employees. *See Policemen's Benevolent Ass'n of New Jersey v. Township of Washington*, 672 F.Supp. 779 (D.N.J.1987) (random testing and mandatory annual testing of township police officers unconstitutional unless based on reasonable articulated suspicion); *Taylor v. O'Grady*, 669 F.Supp. 1422 (N.D.Ill.1987) (mandatory testing of correctional officers and supervisors unconstitutional without reasonable suspicion of illegal drug use); *Amalgamated Transit Union Local 1277 v. Sunline Transit Agency*, 663 F.Supp. 1560 (C.D.Cal.1987) (municipal bus company's testing policy constituted unreasonable search to extent it authorized testing on less than reasonable suspicion); *Feliciano v. City of Cleveland*, 661 F.Supp. 578 (N.D.Ohio 1987) (when not based on individualized suspicion, testing of police academy cadets was unreasonable); *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986) (mass testing of city firefight-

ers constituted an unreasonable search within meaning of Fourth Amendment).

By contrast, only one court has concluded that random testing of state employees is reasonable. *See McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987) (random testing reasonable for prison guards having direct daily contact with inmates). Two other courts have reached similar results by relying on the "heavily regulated industry" exception to the Fourth Amendment. *See Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.) (jockeys), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986); *Rushton v. Nebraska Public Power District*, 653 F.Supp. 1510 (D.Neb.1987) (nuclear power plant employees).

**9.** Because *NFFE* enjoins precisely the same testing program that is at issue here, some might argue that it is unnecessary for this Court to issue another opinion. This Court disagrees. Though it supports the result reached in *NFFE*,

After an extensive review of existing drug testing cases, including this Court's preliminary injunction opinion, the *NFFE* Court concluded that the Army's program constituted an unreasonable search within the meaning of the Fourth Amendment. *See NFFE*, at 432–35. Accordingly, the *NFFE* Court enjoined the Army from testing its civilian employees without any reasonable, articulated, individualized suspicion that they were impaired by drugs or alcohol while at work. *See NFFE*, Order at 436.

If these cases demonstrate any discernible trend, it is only the necessity of careful case-by-case adjudication.[10] On the facts of this case, as the Court indicated when it issued its preliminary injunction, the balance of interests mandates that the Army's program be declared unconstitutional. Few, if any, activities prompt as strong an expectation of privacy as the act of passing urine. And yet, with its testing program, the Army proposes to ignore this expectation and command their civilian employees to produce specimens in the presence of another, at a time over which the employees have no control.[11] Though defendants allude to several safety-related reasons in an attempt to justify this intrusion, they have not produced any evidence suggesting that these plaintiffs are using illegal drugs on the job or are impaired on the job from the use of illegal drugs.[12] Without such a reasonable, articulable, individualized sus-

picion of drug use, the Court cannot validate the Army's proposed search.

At its previous hearing, the Court determined that plaintiffs were entitled to preliminary injunctive relief in order to protect them from irreparable harm and because they had demonstrated a substantial likelihood of success on the merits. *Compare Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 195 (4th Cir. 1977). Because plaintiffs have in fact succeeded in showing the unconstitutionality of defendants' testing program, plaintiffs are now entitled to permanent injunctive relief. *See, e.g., Borden v. Sinskey*, 530 F.2d 478 (3d Cir.1976) (extending preliminary injunction after plaintiff ultimately prevailed on merits).

A separate Judgment Order shall follow.

## JUDGMENT ORDER

In accordance with the Memorandum dated March 28th, 1988, and filed in this case, it is this 28th day of March, 1988, by the United States District Court for the District of Maryland,

ORDERED and ADJUDGED:

1. That defendants' renewed motion for summary judgment is hereby DENIED;

2. That drug testing through random, mandatory urinalysis absent reasonable suspicion of drug use, as applied to plain-

---

this Court is somewhat uncomfortable with *NFFE*'s apparent reliance on the technological merit of the urinalysis itself. By concluding that the Army's test is too imprecise to use in random testing, the *NFFE* Court implies that random use of a better test would be constitutional. Because it cannot let an individual's Fourth Amendment rights turn on the ebb and flow of technological changes, this Court must offer a separate basis for reaching *NFFE*'s result.

10. *Compare Mullholland*, 660 F.Supp. at 1569 ("[d]etermination of Fourth Amendment reasonableness necessitates consideration of the totality of the circumstances in each case, weighing all of the factors indicating constitutional violation against all others showing validity ...").

11. Even if the Army's program operated in other, more private conditions, the urinalysis itself would be intrusive because of its ability to reveal information such as the kinds of prescribed medication an employee is taking and whether

a female employee is pregnant. In describing the invasion that urinalysis entails, one court said "... such tests may provide Government officials with a periscope through which they can peer into an individual's behavior in her private life, even in her home." *Jones v. McKenzie*, 833 F.2d 335, 339 (D.C.Cir.1987).

12. Nor have defendants demonstrated the impracticality of other alternative methods of detecting drug use or impairment. One such alternative was discussed by Judge Getzendanner in *Taylor v. O'Grady*, 669 F.Supp. 1422, 1431–33 (N.D.Ill.1987). According to trial testimony, rather than subject correctional employees to random testing, defendants could have trained correctional supervisors to detect drug use from easily-identifiable changes in behavior. Judge Getzendanner went on to hold that random testing of correctional officers and supervisors was unconstitutional. *See id.* at 1442–43.

tiffs Sandra Thomson and George Stout, is unconstitutional;

3. That defendants are hereby enjoined from implementing any drug testing by urinalysis with respect to plaintiffs Sandra Thomson and George Stout absent reasonable suspicion of drug use, and that defendants are further enjoined from requiring any further written consent from plaintiffs Sandra Thomson and George Stout to the collection of urine samples from them, and that defendants are further enjoined from instituting or prosecuting any adverse personnel action against Sandra Thomson and George Stout should either refuse to participate in any drug testing by urinalysis absent reasonable suspicion of drug use.