NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., Plaintiffs,

v.

Frank C. CARLUCCI, Secretary of Defense, et al., Defendants.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al., Plaintiffs,

v.

Frank C. CARLUCCI, Secretary of Defense, et al., Defendants.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al., Plaintiffs,

v.

Frank C. CARLUCCI, Secretary of Defense, et al., Defendants.

Civ. A. Nos. 86–0681, 87–1797 and 87–2350.

United States District Court, District of Columbia.

July 6, 1988.

Bruce P. Heppen, National Federation of Fed. Employees, Joe Goldberg, American Federation of Government Employees, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Anne M. Gulyassy, Shalom Brilliant, Attys., U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

On March 1, 1988, this Court entered a preliminary injunction against random urinalysis drug testing of civilian employees of the United States Department of the Army. *National Federation of Federal Employees v. Carlucci*, 680 F.Supp. 416 (D.D.C.1988), *appeal docketed*, No. 88–5080 (D.C.Cir. March 16, 1988). After a hearing on March 11, 1988, the Court en-

tered orders clarifying the preliminary injunction and denying defendants' motion for a stay pending appeal. On March 30, 1988, the Court of Appeals granted defendants' motion for a stay pending appeal. No. 88–5080 (D.C.Cir. Mar. 30, 1988) (order granting stay pending appeal).

At the hearing on March 11, 1988, defendants' counsel moved for entry of final judgment, announcing themselves satisfied with the state of the record. Plaintiffs' counsel opposed the motion on the ground that additional discovery was required. The Court denied the motion for entry of final judgment. The discovery sought by plaintiffs has now been completed, and defendants have renewed their motion for entry of final judgment.

■ The Court addressed the substantial and difficult issues presented by random urinalysis drug testing at length in its Memorandum Opinion of March 1, 1988. There is no need to replow that ground. Instead, the Court will review relevant developments, factual and legal, of the past four months and, incorporating its earlier Memorandum Opinion, enter a permanent injunction pursuant to Fed.R.Civ.P. 65(a)(2). The Court concludes, with the assent of counsel for both parties, that in light of the Court's analysis there remain no genuine issues of material fact for trial and judgment is appropriate under Fed.R.Civ.P. 56. This Memorandum Opinion and the Memorandum Opinion of March 1, 1988, constitute the Court's findings of fact and conclusions of law.

### Factual Developments

The parties have entered into a number of stipulations of fact that are relevant to the issues presented. The stipulations, which were made a part of the record by filing with the Clerk on June 27, 1988, can be summarized as follows:

—In implementing the Army civilian drug testing program,[1] defendants did not rely upon any statistical information concerning the incidence of accident or safety violations by employees subject to testing, or the incidence of accident or safety violations caused by the use of tested-for drugs among covered employees.

—In implementing the Army civilian drug testing program, defendants did not rely upon any statistical information concerning the incidence of security violations by covered employees, or the incidence of security violations caused by use of tested-for drugs among covered employees.

—In implementing the Army civilian drug testing program, defendants did not rely upon any statistical information concerning the incidence of blackmail of covered employees, or the incidence of blackmail caused by use of tested-for drugs among covered employees.

—In designing the Army civilian drug testing program, defendants relied on no statistical information other than the Highlights from the *1983 Worldwide Survey on Nonmedical Drug and Alcohol Use.*[2] Particularly, defendants had no information, other than anecdotal information, regarding: the number of covered employees who used tested-for drugs; the number of covered employees who used tested-for drugs while off duty; the number of covered employees who used tested-for drugs on duty or immediately before reporting for work; the number of covered employees

---

1. The Army civilian drug testing program was implemented by Interim Change No. I11, issued on February 10, 1986. Interim Change No. I11 amended Army Regulation 600–85 to include drug testing of civilians. Interim Change No. I11 was issued pursuant to Department of Defense Directive 1010.9, which authorized each military department to establish a Civilian Employees Drug Abuse Testing Program. Directive 1010.9 was issued on April 8, 1985.

2. The survey, prepared under contract for the Department of Defense, was based on responses to questionnaires mailed to more than 7,000 randomly selected civilian employees of the Department in 1982; 5,154 responses were received. The survey showed that 4 percent of the surveyed employees used some type of drug for nonmedical purposes within the past 30 days; marijuana was the only drug reported in statistically meaningful numbers. By contrast, 14 percent of the civilian employees were classified as "heavy drinkers" on an average day in the past 30 days, that is, consuming four or more drinks. The survey report is included in the June 27, 1988, filing of the parties.

rated less than satisfactory or disciplined because of abuse of tested-for drugs; the number of employees rated less than satisfactory or disciplined because of alcohol abuse.

—The *1983 Worldwide Survey of Nonmedical Drug and Alcohol Use* did not tabulate the number of covered employees who used tested-for drugs.

—A confirmed positive urinalysis test result for marijuana cannot show that the person regularly has been using marijuana or in the future will regularly use marijuana.

—A confirmed positive urinalysis test result cannot determine the date a tested-for drug entered the body.

—A confirmed positive urinalysis test result cannot distinguish between a casual user of a drug and a chronic user of a drug.

—In implementing the Army civilian drug testing program, defendants did not have and did not rely on department-wide information concerning instances of discharge of weapons by civilian guards and police in the line of duty excluding training.

These stipulations of fact support the Court's previous finding that military's civilian drug testing initiative "is not rooted in the discovery of any particular drug problem among its civilian employees or any group of those employees." 680 F.Supp. at 420.

The Court's March 1, 1988, Memorandum Opinion reported results of Army civilian drug testing for a six-month period ending March 31, 1987, which showed 37 positive results in 5,397 urine tests, or .68 percent. 680 F.Supp. at 421. Defendants updated these figures in their Motion for Stay Pending Appeal. In the first 16 months of Army civilian drug testing, through January 31, 1988, a total of 11,233 urinalysis tests were conducted; 74 positive results were obtained, or .66 percent. Of the 74 positive results, 63 were for marijuana, 8 were for cocaine, and 3 were for both. Plaintiffs' Revised Set of Requests for Admissions No. 23 asked defendants to "Admit that the metabolites identified by urinalysis for covered drugs are not psychoactive." The Supplemental Response executed on June 6, 1988, by Dr. Donna R. Smith,[3] states: "Admitted, insofar as the substances identified in the Army testing program for marijuana and cocaine are metabolites." Thus, a positive test result does not show the presence of *active* ingredients of marijuana and cocaine, but *inactive* metabolites.[4]

A number of other responses to Plaintiffs' Revised Set of Requests for Admissions, Interrogatories and Request for Production of Documents are worth noting as well. The defendants' response was executed on May 3, 1988, again by Dr. Smith.

Defendants were asked to admit that no accidents or safety violations by covered employees were caused by employee drug use or being under the influence of a tested-for drug. The defendants said they could neither admit nor deny the statement, because post-accident investigations, even where drug testing is performed, do "not necessarily reach conclusions as to whether the accident was caused by drug use as opposed to some other human error." The response to Request No. 2 continued: "[N]o reported accident was identified in which a covered employee, subsequently-examined for 'tested for' drugs, was determined to have committed some human error attributed to drug use which caused the reported accident."

Nor could defendants point to any instance of blackmail of covered employees attributed to the employee's use of a tested-for drug. *See* Response to Request No. 5. The only instance of a security violation attributed to the use of a tested-for drug

3. Civilian Program Administrator, Alcohol and Drug Policy Office, Office of the Deputy Chief of Staff for Personnel, Headquarters, Department of the Army.

4. The Supplemental Response also states, "The compounds identified in tests for amphetamines, barbiturates, and phencyclidine are unmetabolized psychoactive substances." However, the Army has never reported a positive test result for those drugs, presumably because they are not tested for.

by a covered employee was at the Seneca Army Depot in Romulus, New York, on July 4, 1985, when a security guard reported that another guard had twice used cocaine while on duty. *See* 680 F.Supp. at 421 n. 5.

Other May 3, 1988, admissions that are relevant include:

No. 11. Admit that Department of Defense has no statistics demonstrating a problem of on-duty drug-related impairment among covered employees.

*Response:* Admitted.

No. 14. Admit that urinalysis tests do not test whether the subject is under the influence of, or impaired by, a tested for drug at the time the test is administered.

*Response:* Admitted.

No. 15. Admit that a confirmed positive urinalysis test does not indicate that a person is presently impaired by the drug at the time of the urinalysis test.

*Response:* Admitted.

No. 16. Admit that a confirmed positive urinalysis test does not indicate that a person's performance of his or her duties were affected by the drug.

*Response:* Admitted.

No. 19. Admit that urinalysis testing cannot determine the dosage of a drug which was consumed.

*Response:* Admitted.

No. 24. Admit that defendants are not able to identify any studies which correlate the reported immediate effects of marijuana intoxication, such as loss of short term memory and a decrease in physical coordination, with urinalysis results which are positive for marijuana.

*Response:* Admitted.

No. 25. Admit that defendants are not able to identify any studies which correlate prior marijuana use, more than 24 hours before reporting to work, with on the job impairment.

*Response:* Admitted.

The Court notes that the government disavows the position that urinalysis drug testing can detect on-duty impairment caused by marijuana or cocaine. The government now acknowledges that urinalysis drug testing detects any recent use of tested-for drugs, *off-duty* as well as on-duty. Since it cannot show that off-duty use necessarily has an effect on work performance, *see* Response to Request No. 16, *supra,* the government has advanced two other arguments as justifying the suspicionless search represented by random urinalysis:

First, defendants argue that off-duty drug use may have "hangover effects." The Court previously found these alleged effects to be insufficient justification for the intrusion of random urinalysis testing. 680 F.Supp. 428–29 n. 11. The defendants admit that the scientific evidence of hangover effects is "inconclusive." Defendants' Motion for Stay Pending Appeal at 6.

Second, defendants argue that off-duty drug use "has relevance to the probability of on-duty impairment, and thus might reasonably be considered by an employer in determining whether to maintain an employee in a position involving significant safety concerns. That is all that is required to meet the government's burden of showing that drug tests are 'reasonably related to the objectives' of on-the-job safety and security." Appellants' Motion for Stay Pending Appeal at 9–10, No. 88–5080 (D.C.Cir. Mar. 16, 1988) (quoting *Jones v. McKenzie,* 833 F.2d 335, 340 (D.C.Cir.1987) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 342, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985))), *petition for cert. filed,* 56 U.S.L. W. 3739 (U.S. Apr. 15, 1988) (No. 87–1706).

The Court has two reactions to this argument. First, it disagrees that the law requires only that the test "has relevance to the probability of on-duty impairment." The government would ask the Court to find the requirement of "reasonably related" satisified by *any* relationship. Presumably, the government would consider the requirement satisfied if off-duty drug users were 1 percent more likely to use drugs on duty than those who do not use drugs off duty. In short, *any* predictive value would satisfy the "reasonably related" requirement in the government's view. Surely, something more than *any relationship* is required. The question becomes,

How strong is the relationship? The government does not know. In fact, it admits "that defendants are not able to identify any studies which correlate prior marijuana use, more than 24 hours before reporting to work, with on the job impairment." Response to Request No. 25, *supra.*

Second, the Court remains unconvinced by the July 20, 1987, declaration of George E. Woody, M.D., that many off-duty users of drugs will undergo a "rapid escalation of drug use" that will manifest itself in on-the-job impairment. Woody Decl., ¶ 8. "The result is more frequent use and a greater likelihood of becoming impaired while at work." *Id.,* ¶ 9. Woody cites no studies to support his view, and indeed the government admits that none exist with respect to marijuana. Response to Request No. 25, *supra.* The Court has received absolutely no evidence of the *likelihood* of such a "rapid escalation of drug use" and is unable to give Woody's unsupported statement any weight for purposes of this analysis. The government has announced itself satisfied with the record, and the record fails to support a meaningful correlation between off-duty drug use and on-duty impairment. While "scientific certainty" is not required, mere speculation is not sufficient. *See Berry v. District of Columbia,* 833 F.2d 1031, 1035 (D.C.Cir. 1987) (to justify testing of arrestees, government "must proffer reliable evidence, statistical or otherwise, from which the trial court can reasonably conclude that drug use makes it significantly more likely that an arrestee will commit crimes or fail to appear for scheduled court dates").

A critical difficulty with urinalysis drug testing is that it does not show whether a person is using drugs on the job or poses a significant risk of doing so. A positive result may indicate on-the-job impairment, or it may not; a positive result may increase the odds of future on-the-job impairment, or it may not. The testing simply reveals too little about on-duty activity to make it "reasonably related" to its legitimate purpose, while at the same time revealing so much about off-duty activities as to make it "excessively intrusive." *See*

*Jones v. McKenzie,* 833 F.2d at 340 (quoting *T.L.O,* 469 U.S. at 342, 105 S.Ct. at 743).

### Legal Developments

On the day before the Court preliminarily enjoined Army civilian drug testing, the Supreme Court granted certiorari in *National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988). More recently, the Court granted certiorari in a second drug testing case, *Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.), *cert. granted,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988), and set the cases for oral argument in tandem. While Supreme Court guidance on drug testing is of course welcome, the Court notes that neither case involves random testing.

Another relevant development occurred on March 29, 1988, when Judge Ramsey entered a permanent injunction against random drug testing of two civilian employees of the Army at Aberdeen Proving Ground in Aberdeen, Maryland. *Thomson v. Weinberger,* 682 F.Supp. 829 (D.Md. 1988), *appeal docketed,* No. 88–2838 (4th Cir. June 3, 1988). The testing was part of the same program at issue in this case. Judge Ramsey, who had entered a preliminary injunction against testing of the two employees on February 27, 1987, said he supported the result reached by this Court but "is somewhat uncomfortable with *NFFE*'s apparent reliance on the technological merit of the urinalysis itself. By concluding that the Army's test is too imprecise to use in random testing, the *NFFE* Court implies that random use of a better test would be constitutional. Because it cannot let an individual's Fourth Amendment rights turn on the ebb and flow of technological changes, this Court must offer a separate basis for reaching *NFFE*'s result." 682 F.Supp. 832–33 n. 9.

Fair enough. The Court would merely note that Judge Ramsey was not constrained by *Jones v. McKenzie*'s suggestion that a test measuring on-duty impairment would have a satisfactory nexus to

the employer's legitimate concern, in that case, safety. *See* 833 F.2d 340–41.

The Administration has continued to press its program to test all federal workers in "sensitive" jobs. On May 3, 1988, 42 federal agencies sent detailed plans to Congress calling for random testing of 345,528 federal workers. *U.S. Details Plans for Drug Tests*, Wash. Post, May 4, 1988, at Al, Col 6. The testing plan of the Federal Bureau of Prisons of the United States Department of Justice already has been struck down as unconstitutional. *American Federation of Government Employees v. Meese*, 688 F.Supp. 547 (N.D.Cal. 1988). The Bureau of Prisons designated all of its 13,000 employees, including administrators, secretaries, and other office workers, as "sensitive" and subject to random testing. At 548–49. In entering a preliminary injunction, Senior Judge Weigel distinguished between government attempts to deter drug use in the federal workplace and efforts to deter drug use in general. "The government may certainly take an interest in deterring drug use throughout society, but that interest cannot justify random testing. Otherwise, mass testing of the entire population of the nation would be justified.... The government, the nation's largest employer, may not hide behind that role in attempting to justify intrusive searches of innocent citizens who happen to be in its employ, absent some compelling, articulable interest of the government *qua* employer." *Id.* at 554–55 (citing *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 943 n. 12 (D.C.Cir.1987).

On June 27, 1988, the Justice Department announced plans to test 1,800 of its 6,500 attorneys and other "sensitive" employees working in the Washington, D.C., area in as soon as 60 days. *Justice Dept. Sets Employee Drug Tests*, Wash. Post, June 28, 1988, at A13, col. 1. The following day 42 of those to be tested filed suit challenging the plan. *Harmon v. Meese*, No. 88–1766 (D.D.C. filed June 28, 1988).

A final legal development is worth noting. Until this year, the government could argue that the circuits addressing the issue had upheld drug testing without individualized suspicion. *See Jones v. McKenzie*, 833 F.2d 335 (D.C.Cir.1987); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170 (5th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987); *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.), *cert. denied*, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). In 1988, however, two circuits struck down testing not based on individualized suspicion. First, the Ninth Circuit struck down post-accident testing of railroad workers absent a reasonable suspicion that a test will reveal evidence of current drug or alcohol impairment. *Railway Labor Executives' Association v. Burnley*, 839 F.2d 575 (9th Cir.), *cert. granted*, —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). More recently, the Sixth Circuit struck down mandatory urinalysis testing of fire fighters, *Lovvorn v. City of Chattanooga*, 846 F.2d 1539 (6th Cir.1988), and police officers, *Penny v. Kennedy*, 846 F.2d 1563 (6th Cir.1988).

### Conclusion

■ An appropriate Order entering final judgment and a permanent injunction accompanies this Memorandum Opinion. The only issue remaining is whether the Court should stay the permanent injunction pending appeal. Most regrettably, the D.C. Circuit offered no guidance when it stayed the preliminary injunction pending appeal. The motions panel revealed none of its reasoning when it stated, "We conclude that a stay is warranted in this case. *See WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843–44 (D.C.Cir.1977)." No. 88–5080 (D.C.Cir. Mar. 30, 1988) (order granting stay pending appeal). Such terseness leaves the Court and the parties without insight into the motions panel's logic in a matter where this Court has found an ongoing violation of employees' constitutional rights with possibly severe effects on their careers. This uncertainty is even more unfortunate because it was so avoidable.

The Court can only assume that the Court of Appeals has determined that the Army civilian drug testing program should

**52**

go forward while this case is appealed.[5] The Court fully explored the factual and legal basis of its holding in its March 1, 1988, Memorandum Opinion; while subsequent developments have reinforced the holding, they are not sufficient for the Court to say that today's Memorandum Opinion stands on different footing than its prior decision. Accordingly, the Court shall stay the permanent injunction pending appeal.

### ORDER

Upon consideration of defendants' motion for entry of final judgment and the entire record herein, and for the reasons set forth in the accompanying Memorandum Opinion, it is this 6th day of July, 1988,

ORDERED that judgment is entered for plaintiffs; and it is

FURTHER ORDERED that defendants are hereby permanently enjoined from implementing or enforcing Department of Defense Directive 1010.9 and Interim Change No. I11, amending Army Regulation 660–85, as they pertain to drug testing on a random basis or "on the basis of neutral criteria" of civilian employees of the Department of the Army. This injunction shall not apply to drug testing based upon reasonable suspicion. This injunction also shall not apply to drug testing of applicants for employment, consensual rehabilitative testing, or post-accident testing; and it is

FURTHER ORDERED that the permanent injunction is stayed pending appeal.

---

**5.** On April 15, 1988, the Court of Appeals granted appellees' motion to expedite and directed the case set for argument during the Court's October, 1988, sitting, on the same day and before the same panel reviewing *American Federation of Government Employees v. Dole,* 670 F.Supp. 445 (D.D.C.1987) (upholding random urinalysis drug testing of employees of Department of Transportation), *appeal docketed,* No. 87–5417 (D.C.Cir. Dec. 11, 1987).