**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,**

v.

**Elizabeth H. DOLE, Secretary, Department of Transportation, Defendant.**

Civ. A. No. 87–1815.

United States District Court, District of Columbia.

Sept. 30, 1987.

Mark D. Roth, Joe Goldberg, Washington, D.C., for plaintiffs.

William W. Osborne, Jr., John R. Mooney, Washington, D.C., for amicus curiae, Nat. Air Traffic Controllers.

Robert Cynkar, Richard Greenberg, Dept. of Justice, Richard K. Willard, Wayne Vance, Robert Chesnut, Dept. of Transp., Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This is a suit to enjoin the Department of Transportation ("DOT") from continuing to carry out its random drug testing plan[1] developed under authority of Executive Order 12,564 captioned "Drug-Free Federal Workplace." Exec.Order No. 12,564, 3 C.F.R. 224 (1987). Plaintiff ("AFGE") is a labor union representing certain employees subject to the DOT plan which was announced June 29, 1987, and went into effect September 8, 1987.

DOT has moved for summary judgment and in opposing, AFGE has moved for a preliminary injunction, which in turn is opposed by DOT. Extensive papers have been filed and all issues were fully argued.[2]

The DOT plan under attack here supplements other DOT drug programs for testing certain employees at time of employment and at intervals scheduled well in advance by providing for random urinalysis testing of certain employees in sensitive positions.[3] Only employees having critical jobs and falling in Category I are subject to this random testing. These employees are in jobs concerned with public health, safety, national security, and law enforcement; jobs which involve duties calling for the highest degree of trust and confidence. Each critical position subject to random testing is supported by a written justification statement describing why the job is critical and what would happen if an incumbent used illegal drugs. These justifications are subject to review and are monitored by an Assistant Secretary. Jobs from GS-4 to GS-14 and equivalents are covered, thus including both union and non-union supervisory employees.

Ninety-four percent of the employees covered hold aviation-related positions such as air traffic controllers, electronic technicians, aviation safety inspectors and aircraft mechanics. In addition, fire fighters, nurses, railroad safety inspectors, armed law enforcement officers and "top secret" security clearance personnel are among those subject to random testing. Testing is under considerate procedures reflecting regard for personal privacy.[4] No criminal

1. "Drug-Free Departmental Workplace," U.S. Dep't of Transportation, June 29, 1987.

2. The chronology of this litigation is as follows: AFGE filed the complaint on July 7, 1987 and DOT promptly filed an answer on July 15, 1987. On July 30, DOT moved for summary judgment and AFGE obtained an extension to respond by August 21, with DOT subsequently replying on August 31.
   On August 6, AFGE was advised that if a motion for preliminary injunction were to be filed it could in the Court's absence be heard by the motions judge before Labor Day. AFGE did not file its motion for preliminary injunction until August 21, when responding to defendant's motion for summary judgment. DOT promptly responded in opposition on August 31, and AFGE replied on September 11. Oral argument was heard on Monday, September 14, 1987.

3. Employees in these positions are chosen for random testing through haphazard neutral computer selection. At varying times "from month to month" a list of employees to be tested is randomly selected. Declaration of Melissa J. Allen, Deputy Assistant Secretary for Administration of the Dept. of Transportation, Defendant's Exhibit J at para. 12. All employees subject to random testing have an equal statistical chance to be chosen for each testing list without regard to previous selections. Id. This type of testing is unannounced and could occur on any scheduled workday, apparently once a month, although the number to be involved is not clear from the record. See "Drug-Free Departmental Workplace," U.S. Dep't of Transportation, ch. III, § 4, p. III-2, June 29, 1987.

4. The Department testing plan is in strict accordance with the mandatory policies and procedures outlined in the "Scientific and Technical Guidelines for Drug Testing Programs" issued by the Alcohol, Drug Abuse and Mental Health Administration, Department of Health

use will be made of the results and no discipline other than an offer of rehabilitation service will occur if a first-time random urinalysis test is positive.[5] All disciplinary actions that may occur upon further testing are subject to the Civil Service Reform Act of 1978. 5 U.S.C. § 1201 *et seq.* (1982 & Supp. III 1985).

██ To support its sweeping facial challenge to DOT's random drug testing plan, AFGE relies primarily on the Fourth Amendment to the Constitution,[6] asserting that under the facts and circumstances shown by the affidavits and materials filed, random testing constitutes an unreasonable search.[7] Elaborating, the Union points, among other things, to the admitted lack of probable cause, the lack of indisputable evidence that drug use always impairs employee performance, the lack of results procured in other non-random testing and the excessive intrusion upon privacy which arbitrarily results.

██ The Court clearly has jurisdiction to consider this constitutional challenge. There is no question that mandatory random urine testing is a search within the meaning of the Fourth Amendment under the controlling law of this Circuit, as the guiding precedent, *Nat'l Fed'n of Fed'l Employees v. Weinberger*, 818 F.2d 935, 942 (D.C.Cir.1987), makes clear. However, the Amendment only prohibits "unreasonable" searches, and accordingly the focus of the drug testing case, like other Fourth Amendment testing cases, is factual, requiring the Court to balance factors bearing on reasonableness.[8]

*National Federation of Federal Employees v. Weinberger*, 818 F.2d 935 (D.C. Cir.1987), deals with a urinalysis drug testing program involving civilian employees of the Department of Defense. The Court emphasized that the balancing function concerns the "employees' reasonable expectations of privacy" considered against the " 'government's interest in the efficient and proper operations of the work place.' " *Id.* at 942 (citations omitted).

As to the employees' privacy expectations, relevant factors include the nature and quality of the intrusion or search and whether employees have had reasonable advance notice and, of course, familiarity with testing safeguards and procedures of

and Human Services, on February 13, 1987 (changed language July 20, 1987). —— Fed.Reg. —— (1987).

5. Before any official action is taken, positive test results are first reported to the Medical Review Officer ("MRO"). The MRO, in turn, contacts the employee and gives him or her the opportunity to explain the test results as well as reviewing medical records submitted by the employee or any other relevant biomedical factors necessary to determine whether there is a legitimate medical explanation for the positive result. If the MRO determines that a legitimate medical explanation exists, the test results may be reported as negative. Thus, for example, an employee who uses a spouse's prescription medication without medical consultation for a similar ailment and tests positive would be given the opportunity to provide a legitimate medical explanation for the test results.

6. The nonconstitutional claims are not significant. Even if a drug user is considered handicapped, freedom from drug effects is a proper standard governing critical jobs. *See Heron v. McGuire*, 803 F.2d 67 (2nd Cir.1986) (per curiam). This has long been accepted in these critical jobs with few exceptions and, accepting the agency's expert's view that drug use will injure job performance, there is nothing arbitrary or unreasonable in pursuing a drug-free workplace for such employees through random testing. Moreover, the tests are scientifically pointed to current drug usage (*i.e.,* use within several days or hours prior to testing) and do not offend The Drug Abuse Office and Treatment Act. 42 U.S.C. § 290ee–1(c)(1) (Supp. III 1985). Under the test laid down by this Circuit, probable cause is not required where a governmental employee's drug usage might endanger public health or safety and criminal sanctions following a positive test are not contemplated. *See Nat'l Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935, 942–43 & n. 12 (D.C.Cir.1987).

7. There were no formal rule-making proceedings since the plan involves an internal personnel policy and AFGE has undertaken no formal discovery. *See* 5 U.S.C. § 553(a)(2) (1982) (notice of proposed rulemaking shall be published "except to the extent that is involved— ... (2) a matter relating to agency management or personnel ..."); *Stewart v. Smith*, 673 F.2d 485 (D.C.Cir.1982).

8. *See, e.g., Nat'l Employees Treasury Union v. Von Raab*, 816 F.2d 170 (5th Cir.1987); *McDonell v. Hunter*, 809 F.2d 1302 (8th Cir.1987); *Local 1812, American Fed'n of Gov't Employees v. Dep't of State*, 662 F.Supp. 50 (D.D.C.1987).

the plan after its effective date. In this situation 60 days' advance notice was given. Moreover, most employees subject to the random testing have had their urine tested for drug use at various times during their employment at scheduled intervals. The random testing is obviously somewhat more intrusive than the scheduled testing since it occurs in the midst of a day's work, and necessarily focuses special attention on a particular employee whose name crops up through chance computer selection.[9] Testing itself is discreet and private.

On the other side of the balance the Court must consider issues raised in the litigation which go to the government's justification for its random testing plan. These involve: considering whether the search was justified at its inception, whether there are reasonable grounds to suspect work related drug use will be uncovered, whether those subjected to the test, generally speaking, are only those who in fact occupy critical positions affecting safety and security and whether use of illegal drugs is likely to impair a critical employee's work efficiency.

AFGE contends:

(1) that the true purpose of the testing is law enforcement, not safety and security;

(2) that based on past experience the testing will not prove productive;

(3) that many subjected to random testing are not, in fact, in critical jobs; and

(4) that recent drug use, medically speaking, cannot necessarily be shown to affect employment efficiency.

These positions are not supported in the factual record before the Court insofar as they may have legal relevance to the challenged testing personnel policy announced. They are considered seriatim below:

(i) No ulterior motive was established. DOT simply realized that illegal drug use has not been eliminated by criminal law enforcement and felt an obligation to protect public safety and to gain confidence for its programs. Tests are not used for criminal law enforcement purposes.

(ii) The fact that testing after substantial advance notice has not resulted in many positive urine samples bears little or no relationship to what may occur from random testing. The prospect of a random test may well itself be prophylactic and scheduled testing gives no measure of the random programs effectiveness.

(iii) AFGE presented no proof in support of its claim that noncritical jobs are involved. The three examples used by plaintiff in its brief proved fully justified within the program.[10]

(iv) DOT presented proof that drug use, at the level sought by testing generally impairs the normal functioning of employees.

■ Thus, on balance, the preponderance of the proof supports the reasonableness of

---

**9.** This possible "shock" aspect can be minimized if the random, nonspecific nature of the testing is explained clearly at the time it occurs, emphasizing the lack of specific cause both to the employee selected and others in the workplace who become aware of the testing.

**10.** AFGE cites, in cursory fashion, three examples in its brief of positions within Category I it claims are not safety or security sensitive—mail van operator, Federal Railroad Administration Hazardous Material Inspector and FAA aircraft mechanic. Affidavits from Operating Element heads who must file job category justification statements effectively refute these contentions. Hazardous materials inspectors are "exposed to poisonous, explosive, and highly flammable commodities that could be leaking from rail cars or containers, or suddenly ignited by improper handling." Declaration of Melissa J. Allen, Deputy Assistant Secretary for Administra-

tion of the Department of Transportation, Defendant's Exhibit J at para. 11(d). Aircraft mechanics in the Department's Coast Guard and FAA perform a variety of tasks involving the installation, inspection and maintenance of aviation equipment and "failure to perform properly any of these duties could result in an aircraft crash." *Id.* at para. 11(e). Finally, as to the motor vehicle operators in the Department, all operators are subject to background investigations and have either a "Top Secret" or "Secret" security clearance. Declaration of Gary McCullough, Deputy Chief, Personal Property Division, Office of Administrative Services and Property Management, Defendant's Exhibit N at para. 4. These drivers perform tasks including: transportation of visiting foreign dignitaries and key DOT officials, carrying classified documents and driving shuttle buses—all either safety or security related duties. *Id.*

the random plan. DOT's duty to assure the integrity of its sensitive aviation and other critical jobs and to protect the public safety is undisputed. The plan reflects a high degree of concern for employee privacy interests and is carefully tailored to assure a minimum of intrusion. The plan must be sustained against this generalized facial attack.

There is no proof of any results from a single random test under the plan or indeed that one has occurred. The written justification for each job in the critical category was not produced by either side. Thus the broad facial challenge to the entire plan has come to the Court in an incomplete and untested context. Given the sparse record and perhaps premature nature of the attack, the Court's conclusion leaves open the way for a later, more specific challenge clearly directed to a job category or to the beneficial or ineffective nature of the random program after its effectiveness can be measured by ample experience.

In view of the limited form in which this matter has been presented and to guarantee more informed review should a more specific, discrete claim be later advanced to some aspect of the plan as it develops, the Secretary shall maintain full records of each random test and subsequent personnel actions taken and it will be highly advisable to develop more precise procedures for informing any individual selected for a random test while safeguarding the employee against any possibility of misunderstanding in his immediate work place as to the circumstances under which the particular employee has been singled out.

AFGE has failed to support its challenge to the random drug testing plan or to demonstrate that the individual plaintiffs should be exempted by reason of the nature of their duties. The random urine drug testing plan is reasonable on its face and must be sustained at this stage. Summary judgment is granted for the Secretary and AFGE's motion for preliminary junction is denied. The complaint is dismissed. An appropriate Order is filed herewith.

## ORDER

Upon consideration of plaintiffs' motion for preliminary injunction and defendant's motion for summary judgment, the responses thereto and the entire record, and for the reasons set forth in the Court's Memorandum filed this day, it is hereby

ORDERED that defendant's motion for summary judgment is granted; and it is further

ORDERED that to facilitate any subsequent factual challenge to any aspect of the random testing, the Court directs that the Department of Transportation maintain full records of each random test and any subsequent personnel actions taken as a result of such testing pending further Order of the Court; and it is further

ORDERED that plaintiff's motion for preliminary injunction is denied.