**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Appellants,**

v.

**Samuel K. SKINNER, Secretary Department of Transportation, et al.**

No. 87–5417.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1988.

Decided Sept. 8, 1989.

Joe Goldberg, with whom Mark D. Roth and Charles A. Hobbie, Washington, D.C., were on the brief, for appellants.

John R. Bolton, Asst. Atty. Gen., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., Leonard Schaitman and Robert V. Zener, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

William W. Osborne, Jr. and John R. Mooney, Washington, D.C., were on the brief, for amicus curiae urging reversal.

Before WALD, Chief Judge; MIKVA and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

On June 29, 1987, the Secretary of Transportation announced a plan for testing certain employees of the Department of Transportation ("Department") for unlawful drug use. Order 3910.1, "Drug–Free Departmental Workplace," U.S. Dep't of Transportation, June 29, 1987 ("Order 3910.1"), Joint Appendix ("J.A.") at 17. Depending on the safety and security "criticalness" of the duties or prospective duties, employees and applicants may be subjected to urinalysis in one or more of seven circumstances.[1] Those employed in "Category I" positions—jobs determined by the Department to have a direct impact on public health, safety, or national security—may be required to submit to random testing.

Appellants, the American Federation of Government Employees and certain Category I employees, brought suit to enjoin the suspicionless testing, alleging, *inter alia*, violations of the Fourth and Fifth Amendments, the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–795i (1982 & Supp. V 1988), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.* (1982). The District Court's Fourth Amendment analysis focused on our opinion in *NFFE v. Weinberger*, 818 F.2d 935 (D.C.Cir.1987), which the trial court interpreted to require the balancing of factors bearing on reasonableness. *AFGE v. Dole*, 670 F.Supp. 445, 447 (D.D.C.1987). After weighing a variety of factors,[2] the Court determined that, on balance, "[t]he random urine drug testing plan is reasonable on its face and must be sustained at this stage." *Id.* The Court disposed of appellants' statutory challenges in short order, concluding in a footnote that they were "not significant." *Id.* at 447 n. 6. Accordingly, the Court granted the Department's motion for summary judgment.

In this appeal appellants renew their contentions of Fourth Amendment and statutory violations. We affirm.

## I.

According to Executive Order 12,564, signed by President Ronald Reagan on September 15, 1986, on- or off-duty illegal drug use by federal employees "evidences less than the complete reliability, stability, and good judgment that is consistent with access to sensitive information and creates the possibility of coercion, influence, and irresponsible action under pressure." Exec. Order No. 12,564, 3 C.F.R. 224 (1987), *reprinted in* 5 U.S.C. § 7301 note at 175–77 (Supp. IV 1986). The Order accordingly directed executive-branch agencies to establish mandatory programs to test employees in "sensitive positions" for the use of illegal drugs. The Department became

---

1. Order 3910.1 provides for the following types of testing:
(1) random; (2) periodic; (3) reasonable suspicion; (4) pre-employment/pre-appointment; (5) accident or unsafe practice; (6) voluntary; and (7) follow-up. Order 3910.1, Ch. III § 3(A), J.A. at 28–29. All covered employees are subject to reasonable suspicion, accident or unsafe practice, and voluntary testing. Only those who participate in a drug rehabilitation and/or abatement program are subject to follow-up testing. *Id.* § 4(G), J.A. at 30. Periodic testing may be required for certain employees who are already required to be periodically medically examined. *Id.* § 3(A), J.A. at 29.

2. On the governmental side of the Fourth Amendment balance, the Court weighed "wheth-er the search was justified at its inception, whether there are reasonable grounds to suspect work related drug use will be uncovered, whether those subjected to the test ... are only those who in fact occupy critical positions ... and whether use of illegal drugs is likely to impair a critical employment work efficiency." 670 F.Supp. at 448. On the other side of the balance, the District Court weighed the employees' privacy interests, while identifying factors tending to diminish that interest. The Court emphasized the Department's advance notice of program implementation, the employees' "familiarity with testing safeguards and procedures," the preexistence of a periodic urinalysis testing program, and the "discreet and private" testing procedures. *Id.* at 447–48.

the first executive agency to implement a drug-testing program pursuant to the President's Order. Departmental Order 3910.1 establishes two categories of employees subject to testing, so designated because of their "safety and security criticalness." Order 3910.1, Ch. III, § 2, J.A. at 28. Employees whose positions bear "a direct and immediate impact on public health and safety, the protection of life and property, law enforcement, or national security," *i.e.*, Category I employees, are made subject to five types of testing: (1) random; (2) periodic "if they are required to take periodic physical examinations"; (3) reasonable suspicion; (4) accident or unsafe practice; and (5) follow-up. Order 3901.1, Ch. III, § 3(A), J.A. at 28–29. All applicants for Category I positions must submit to pre-appointment testing. *Id.*, J.A. at 29. All other employees in sensitive positions, classified as "Category II" employees, are subject to reasonable suspicion, accident or unsafe practice, and follow-up testing. *Id.* § 3(B), J.A. at 29. As of June, 1987, the Department had classified nearly 30,000 of its approximately 62,000 employees in Category I. J.A. at 769.

Nearly two-thirds of the employees subject to random and periodic urinalysis testing are air traffic controllers, *id.*, a group of employees not party to these proceedings, *see* Brief for Appellants at 23 n. 17.[3] Nearly twenty-two percent are employed as "electronic technicians." J.A. at 769. The remaining twelve percent are, among others, aviation safety inspectors (3%), motor carrier and highway safety specialists (1%), railroad safety inspectors (1.1%), civil aviation security specialists (.9%), aircraft mechanics (.7%), and motor vehicle operators (.2%). *Id.* at 769–70.[4]

The testing procedures employed by the Department are substantially identical to those used by the Army to test its civilians, which we outlined in *NFFE v. Cheney*, 884 F.2d 603 (D.C.Cir.1989). Order 3910.1 explicitly provides that the guidelines for drug testing published by the Department of Health and Human Services are to govern. Order 3910.1, Ch. III, § 1, J.A. at 28. *See* "Mandatory Guidelines for Federal Workplace Drug Testing, Programs," 53 Fed.Reg. 11,970 (Apr. 11, 1988) ("HHS Regulations" or "HHS Reg."). Order 3910.1 supplements the HHS Regulations with additional safeguards to be followed in both the sample-collection process and in the chain of specimen-custody. Order 3910.1 Ch. III, §§ 8–10, J.A. at 32–39. Like

---

3. The National Air Traffic Controllers Association, exclusive bargaining representative of the approximately 12,000 controllers employed by the Federal Aviation Administration, a subordinate agency of the Department, appeared as an amicus curiae in these proceedings.

4. The complete list of covered employees is as follows:

Office of the Secretary: motor vehicle operators.

United States Coast Guard: firefighters, nurses, criminal investigators, vessel traffic controllers, maritime traffic controllers (pilot), electronics mechanics, aircraft electricians, instrument mechanics, metals inspectors, shipwright foremen, transportation equipment operation family, aircraft oxygen equipment mechanics, aircraft engine mechanics, aircraft mechanics, master pilots (ferryboat), chief engineers (ferryboat), oiler (ferryboat and diesel).

Federal Aviation Administration: electronics technicians, civil aviation security specialists, aviation safety inspectors, air traffic control specialists, inspection/flight test pilots, transportation equipment operation family, aircraft mechanics.

Federal Highway Administration: highway safety specialists, motor carrier safety specialists, transportation equipment operation family.

Federal Railroad Administration: industrial hygienists (headquarters), general engineer (field and headquarters), civil engineers (field and headquarters), railroad safety series (field and headquarters), motor vehicle operators, safety engineer (headquarters), mechanical engineers (headquarters), electrical engineers (headquarters), chemical engineer (headquarters), transportation specialists (headquarters).

Saint Lawrence Seaway Development Corporation: lock and dam operators, vessel traffic controllers, transportation equipment operation family.

Office of Inspector General: criminal investigators.

Maritime Administration: transportation equipment operation family, engineers (watchstander), maritime general maintenance mechanics (deck/engine).

*See* Order 3910.1 Appendix A. The record does not reveal the allocation of employees in the various covered positions.

the Army, the Department considers a test result positive for proscribed drugs only if it is positive on each of two separate tests, an initial test using immunoassay methods and a confirmatory test using gas chromatography/mass spectrometry (GC/MS) techniques. *See* HHS Reg. § 2(4)(e)–(f). "All specimens negative on [the] initial test or negative on the confirmatory test *shall be reported as negative.*" Order 3910.1, Ch. III, § 9(B), J.A. at 38 (emphasis in original). The Department, like the Army, tests urine for the presence of five drugs (or their metabolites): marijuana, cocaine, PCP, opiates, and amphetamines. *Id.* 11(A)(1)–(5), J.A. at 39–40.

Unlike the Army program, the Department's plan permits an employee who has tested positive to insist that the sample be tested again, either at the site of the original tests or, at his own expense, "at another qualified laboratory identified by the employee." *Id.* § 9(E), J.A. at 39. Although a Category I employee who tests positive "will be assigned non-safety or non-security duties," *id.* Ch. IV, § 6, J.A. at 42, he may not be discharged solely because of a single positive test result, *id.* Ch. VI, § 1(B), J.A. at 45. Absent additional circumstances, an employee will be removed from federal service only if he tests positive a second time.[5]

## II.

As in *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), and *Cheney, supra,* our analysis in the instant case is guided by the Supreme Court's recent opinions in *National Treasury Employees Union v. Von Raab*, — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and *Skinner v. Railway Labor Executives' Association,* — U.S. —, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In *Von Raab*, the Court sustained urinalysis testing of United States Customs Service employees slated for promotions into positions that involved either interdicting illicit drugs or carrying a firearm. 109 S.Ct. at 1397. The Court withheld judgment on the reasonableness of testing employees solely because they would handle classified material, instead remanding the case to the Court of Appeals so that it could "clarify the scope of this category of employees." *Id.* In *Skinner*, the Court upheld the Federal Railroad Administration ("FRA") regulations authorizing railroads to toxicologically test certain employees involved in train accidents or incidents of violations of safety rules. 109 S.Ct. at 1420–21. In both cases the Court concluded that suspicionless testing, while a search, was reasonable and thus conformed with the dictates of the Fourth Amendment.

In their supplemental brief, filed at our direction after the Supreme Court issued its opinions, appellants argue that *Skinner* and *Von Raab* "should have little or no impact upon the decision in the instant case." Supplemental Brief for Appellants at 2. On a general level, appellants contend that "the results of *NTEU* and *RLEA* have no bearing on the employees in the instant case," who are neither engaged in drug interdiction nor employed as "operational members of train crews." *Id.* at 1. Appellants also argue that random testing, the exclusive focus of our attention,[6] is

---

5. The Department retains the right to remove immediately certain drug-using employees, including employees found to be using illegal drugs on duty or determined to have engaged in certain drug-related offenses. Immediate discharge is also required for certain testing-related violations: refusal to enter or successfully complete a rehabilitation/abatement program, refusal to provide a specimen, and adulteration or substitution of a specimen. *See* Order 3910.-1, Ch. VI, § 1(A)–(F), J.A. at 45.

6. While it is not clear which aspects of the District Court's order appellants intended to bring forward on appeal, *compare* Brief for Appellants at 8 n. 9 ("Appellants seek appeal of the district courts [sic] dismissal only as to random, periodic, and accident or unsafe practice drug testing.") *with* Supplemental Brief for Appellants at 1 n. 2 ("The appellees [sic] have challenged only random, and accident or unsafe practice testing."), in their most recent submission appellants appear to indicate that their challenge is directed exclusively at random testing, *id. But see id.* at 7 (Random testing is "the principle [sic] issue of the case presently before the Court."). We consider only the random aspect of the Department's plan, both because it was the only aspect appellants challenged in their complaint, *see* Complaint for Declaratory and Injunctive Relief at 2, J.A. at 2, and because

"vastly more intrusive than the limited drug testing" approved by the Supreme Court. *Id.*

■ We first must determine whether the Department's plan "serves special governmental needs, beyond the normal need of law enforcement." *Von Raab,* 109 S.Ct. at 1390. If it does, *Skinner* and *Von Raab* make clear that the plan need not necessarily be supported by probable cause or any level of particularized suspicion in order to be constitutional. *Id.; Skinner,* 109 S.Ct. at 1414, 1417. Appellants point out that the Department tests only for the presence of *illegal* drugs—rather than for any performance-impairing agent—thus making "clear that the agency's concern is law enforcement rather than direct public safety." Brief for Appellants at 27. Moreover, the failure to test for legal drugs such as valium "makes a mockery out of the agency's pious protestations of concern with public safety." *Id.* at 28. Amicus similarly argues that the "true objectives" of the Department's program have been displaced by "a more saleable" rationale based on the Department's "rather idiosyncratic" aviation safety rationale. Brief for Amicus Curiae at 4, 3.

These contentions give us little pause. Initially, even if we were to assume, as amicus contends, *id.* at 5 n. 4, that the animating motive behind Executive Order 12,564 was the mandatory testing of all federal employees,[7] the Department's program tests only those whose duties bear "a direct and immediate impact on public health and safety, the protection of life and property, law enforcement or national security." Order 3910.1, Ch. III, § 3(A), J.A. at 28. Law enforcement appears nowhere among the program's stated goals, and

more to the point, non-consensual disclosure of test results to police authorities is proscribed both by regulation and statute. *See* HHS Reg. § 2.8; Pub.L. No. 100–71, § 503(e), 101 Stat. 471 (1987).

■ There can be little doubt, then, that the testing plan serves needs other than law enforcement, and therefore need not necessarily be supported by any level of particularized suspicion. In order to determine the appropriate standard of reasonableness, we are "to balance the individual[s'] privacy expectations against the Government's interest to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab,* 109 S.Ct. at 1390. *Accord Skinner,* 109 S.Ct. at 1414; *see also O'Connor v. Ortega,* 480 U.S. 709, 719, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987). This approach necessarily recognizes that not every invasion of privacy is proscribed by the Fourth Amendment. If a careful balancing of interests suggests that the public interest would be best served by requiring a standard of reasonableness short of particularized suspicion, we should not hesitate to adopt that standard. *Cf. New Jersey v. T.L.O.,* 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1984) (adopting reasonableness balancing instead of probable cause). The balance we strike in the present case is substantially identical to that struck by the Supreme Court in *Skinner* and by us in *Cheney.*

### III.

The Department identified as Category I personnel those employed in some twenty different positions relating to air, rail, highway, and water transportation.[8] More

it was the only aspect passed upon by the District Court, *see* 670 F.Supp. at 449.

7. This contention is belied by the fact that the Order recommends testing only for those who occupy jobs "sensitive" from the standpoint of security, health, and safety.

8. The Department deemed the following positions as those having the necessary impact on public health, safety, or national security to warrant their inclusion in Category I: motor vehicle operators; criminal investigators; vessel

traffic controllers; air traffic controllers; mechanics (general maintenance, electronic, instrument, aircraft oxygen equipment, aircraft engine); aircraft electricians; inspectors (metals, aviation, railroad safety series); transportation equipment operation family; pilots (master, inspection/flight test); civil aviation security specialists; safety specialists (highway, motor carrier, railroad, safety engineer); engineers (general, civil, mechanical, electrical, chemical); firefighters; nurses; shipwright foremen; chief engineers (ferryboat); oiler (ferryboat and die-

than 94% of the employees subject to random testing under the plan work for the Federal Aviation Administration ("FAA"). J.A. at 769. As we noted earlier, nearly two-thirds of the covered employees occupy a single position, air traffic controller, and are not parties to this litigation. *See supra* note 3 and accompanying text. Of the remainder, most are, to varying degrees, employed in positions relating to transportation safety, among them mechanics, inspectors, and engineers.

As the District Court noted, written justifications were not produced for each covered position. *See* 670 F.Supp. at 449. Nor for that matter have appellants at any stage in this litigation challenged the inclusion of the vast majority of the categories of employees. Rather, they have singled out three categories, arguing that their inclusion evidences the unreasonableness of the entire testing regime.

Before addressing the three specifically challenged positions, we note that the record amply evidences the extraordinary safety sensitivity of the bulk of the covered positions. For example, FRA safety inspectors and safety specialists are charged with the duties of reviewing railroad operating practices, inspecting track and signal conditions, and enforcing compliance with safety laws and regulations. J.A. at 465. The Federal Highway Administration's highway and motor carrier safety specialists are charged with similar duties, including handling of hazardous materials, investigating trucking companies' safety system, and exploring unsafe practices complaints. J.A. at 771.

The duties of lock and dam operators at the Saint Lawrence Seaway Development Corporation, an operating administration within the Department, are responsible for guiding commercial vessels and pleasure craft through the lock area, which includes the lock chamber, adjacent control towers, and approach walls. Lock operators are responsible for negotiating craft through the lock chamber. J.A. at 471–72. Vessel

traffic controllers are similarly responsible for navigating traffic along 140 miles of the St. Lawrence River, its twenty ports, and Lake Ontario. J.A. at 472.

It would appear that the Supreme Court's rationale for upholding testing of certain railroad personnel in *Skinner* is the natural starting point to determine whether the Department's asserted safety interests justify the testing of employees so intimately involved with safe transportation. In *Skinner*, the Supreme Court reviewed FRA-adopted regulations authorizing private railroads to toxicologically test certain of their employees. Under the FRA regulations, private railroads are empowered to subject to urine and blood or breath tests all railway crew members and other covered employees "directly involved" in certain incidents and specified safety breaches. Like the Department's program, the FRA regulations provide for two types of urine testing, a screening test and a confirmatory test utilizing gas chromatography/mass spectrometry methods, before a sample is deemed positive for the presence of drugs.

The Court identified several governmental interests advanced by testing railroad crew members who perform "duties fraught with ... risks of injury." *Skinner*, 109 S.Ct. at 1419. First, testing would promote the compelling interest of detecting regular drug users, who, the Court determined, could "cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.* Second, "the FRA regulations supply an effective means of deterring employees engaged in safety-sensitive tasks from using controlled substances or alcohol in the first place." *Id.* Thus, because testing was precipitated by "a triggering event, the timing of which no employee can predict with certainty," testing would likely serve as an effective deterrent against on-duty impairment. *Id.* at 1420. Finally, post-incident testing results would "help railroads obtain invaluable information about the causes of major accidents ... and to take

sel); electronics technicians; industrial hygienists; transportation specialists; lock and dam

operators.

appropriate measures to safeguard the general public." *Id.* at 1420 (citations omitted).

We find this analysis fully applicable in the present case. While it is true that the regulations sustained in *Skinner* required testing only after a triggering event and in a medical environment, we do not find that either of these facts compels "a fundamentally different analysis from that pursued by the Supreme Court." *Harmon,* 878 F.2d at 489. While it is true that random testing may increase employee anxiety and the invasion of subjective expectations of privacy, it also limits discretion in the selection process [9] and presumably enhances drug-use deterrence. Neither can we conclude that testing in a medical environment is a *sine qua non* of constitutionally permissible urine testing, for as even appellants admit, the regulations approved in *Von Raab* provided for samples to be collected by non-medical personnel in a public restroom. *See* Supplemental Brief for Appellants at 4.

We also find applicable the reasoning in our decision in *Jones v. McKenzie,* 833 F.2d 335, 340–41 (D.C.Cir.1987), *vacated sub nom. Jenkins v. Jones,* — U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989), *replaced,* 878 F.2d 1476 (D.C.Cir.1989). Appellee, a school bus attendant in the District of Columbia Public School System's transportation branch, challenged the School System's employee drug-testing program. We found the criteria for testing reasonable, though we questioned the validity of testing procedures on grounds no longer viable in light of the later Supreme Court opinions. After the Supreme Court vacated our judgment in light of *Skinner* and *Von Raab,* we recently reinstated our original judgment after appropriately modifying the accompanying opinion. In so doing, we noted that "the School System clearly had a legitimate justification" for testing "employees involved in the transportation of handicapped children." *Jones,* 878 F.2d 1476, Judgment Order at 2. Given our conclusion in *Jones* that the govern-

mental interest in the health and safety of handicapped children reasonably warranted testing employees who daily transport them, we are hard pressed to develop any theory that would prevent the testing of covered employees in the present case. If anything, the safety justifications presented here are, in the main, more compelling.

■ As we noted earlier, appellants have singled out for attack the inclusion of three categories of employees: motor vehicle operators, FRA hazardous material inspectors, and FAA aircraft mechanics. *See* Brief for Appellants at 28–29; *cf.* Supplemental Brief for Appellants at 1 n. 1. The District Court concluded that the inclusion of these employees was "fully justified within the program." *Dole,* 670 F.Supp. at 448. We agree. The record reveals that the assigned duties of a hazardous material inspector require exposure "to poisonous, explosive, and highly flammable commodities that could be ... suddenly ignited by improper handling." J.A. at 771. Furthermore, an FRA inspector may be required to inspect hazardous material shipments and is required to verify proper packaging, rail operating restrictions, and handling and loading requirements. J.A. at 466. Appellants have offered nothing to rebut these claims. Ensuring that these employees— whose exclusive assigned duties are so intimately related to the prevention of public harm—are certifiably drug-free is, in our view, a reasonable precaution against the occurrence of the feared harm. While the danger posed by a drug-impaired inspector may be of somewhat lesser proportions than that posed by one who has "routine access to dangerous nuclear power facilities," *Skinner,* 109 S.Ct. at 1419, it closely parallels the risk posed by drug-impaired Army guards stationed near explosive munitions. *See Cheney,* 884 F.2d at 612. Ultimately, "the public should not bear the risk that employees who may suffer from impaired perception and judgment" occupy positions where they are so responsible for protecting the public. *See Von Raab,* 109 S.Ct. at 1393.

---

**9.** Order 3910.1 requires that each Category I employee "have an equal statistical chance for

being selected for testing within a specified time frame." Order 3910.1, Ch. III, § 4(A), J.A. at 29.

■ Appellants also challenge the inclusion of an FAA aircraft mechanic who inspects and maintains FAA aircraft. We need look no further than our recent opinion in *Cheney* for guidance on this classification. In sustaining the Army's testing of air traffic controllers, pilots, and aviation mechanics, we noted that "[a] single drug-related lapse by any covered employee could have irreversible and calamitous consequences." *Cheney,* at 610. The record in the present case amply supports the same conclusion. Covered mechanics perform pre-flight inspections and overhauls, and install and maintain electronic instrumentation and other flight control equipment. J.A. at 772. Given that a drug-related lapse could portend irreparable injury to life and property, mandatory, random urinalysis does not appear to be an unreasonable means of detecting and preventing that risk. *See also Von Raab,* 109 S.Ct. at 1395 & n. 3; *United States v. Edwards,* 498 F.2d 496, 500 (2d Cir.1974) (reasonableness of search depends on balancing need for search against offensiveness of intrusion); *Cheney,* 884 F.2d at 610.[10]

■ The third challenged position, encompassing one-fifth of one percent of the total number of Category I employees, is motor vehicle operator. *See* J.A. at 262. As their sole argument of unconstitutionality, appellants point to a union member driver whose exclusive duties entail driving a mail van, and ask: "Is this a vital position requiring compromise of the 4th Amendment for an overriding public safety concern?" Brief for Appellants at 28.

As noted by the District Court, strong safety interests support the testing of most Department motor vehicle operators, who are responsible for, *inter alia,* the transportation of visiting foreign dignitaries and key Department officials and the operation of passenger-laden shuttle buses. *See* 670

F.Supp. at 448 n. 10; J.A. at 851–52. Shuttle buses transport as many as 1,200 passengers each day. J.A. at 852. Thus, obvious safety interests support the testing of the majority of the Department's motor vehicle operators. Appellants' objection to the inclusion of motor vehicle operators may in part be rooted in their mistaken understanding of the Department's rationale for testing, which counsel for appellants incorrectly summarized as follows: The "motor vehicle can run into a school bus carrying 312 diplomats, cause an international incident and can then cause a war." Transcript of Proceedings at 9 (Oct. 20, 1988).

The inclusion of a mail van operator does not demonstrate the unreasonableness of the plan. Initially, all drivers are subject to extensive background investigations and have either a top secret or secret security clearance. J.A. at 852. *Von Raab* teaches that the government may properly make urine testing a requirement for those who are "likely to gain access to sensitive information." 109 S.Ct. at 1397. Thus, the Court concluded that employees seeking promotions to positions that would require handling classified information may be required to submit to the Custom Service's tests. Although the Court did not delimit the boundaries of "sensitive information," nor define what categories of information would be sufficiently sensitive to warrant mandatory drug testing,[11] it bears noting that there is no indication in the Court's opinion that testing should be limited to those with the highest security classification.

In *Harmon,* we recognized that whatever the boundaries of "truly sensitive" information, top secret materials "lie at its *very core." Harmon,* 878 F.2d at 492 (emphasis added). Accordingly we sustained the De-

10. While appellants have not argued that testing is unnecessary because of the availability of less intrusive alternatives, the sole mechanic-affiant on which they rely asserted that each mechanic's work is reviewed by a "Quality Assurance Inspector" or "another certified mechanic." Even if the assertion rises to the level of a properly submitted argument, it would fail for essentially the same reasons we rejected the

claim in *Cheney* that drug testing was unnecessary in light of proscriptions already in force. *See Cheney,* at 610–11; *see also Skinner,* 109 S.Ct. at 1419 n. 9.

11. There are three levels of security classification: confidential, secret, and top secret. *See* 47 Fed.Reg. 14,874 (Apr. 6, 1982).

partment of Justice's program mandating drug testing for personnel with top secret clearances. *Id.* at 491–492. At the same time, however, we rejected Justice's claim that its interest in protecting confidential but unclassified information reasonably warranted the random testing of all prosecutors and all personnel with access to grand jury information. As we said there: "[W]e believe that the term [truly sensitive information] cannot include *all* information which is confidential or closed to public view.... The fact that the employees covered by the Department's drug testing regulations deal with confidential information ... does not distinguish them from ... government employees generally." *Id.* at 492 (emphasis in original).

In the present case, we believe that faithful application of the Supreme Court's teachings in *Von Raab* and our own precedent command that we find that the government's interest in protecting truly sensitive information from one who " 'under compulsion of circumstances or for other reasons, ... might compromise [such] information,' " *Von Raab*, 109 S.Ct. at 1396 (quoting *Department of the Navy v. Egan*, 484 U.S. 518, ——, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988)), outweighs the privacy interests of tested mail van operators. Their assigned duties require both the acquisition of a secret or top secret security clearance and regular access to classified information. Moreover, all motor vehicle operators are subject to background investigations, J.A. at 852, which, the Supreme Court has clearly stated, "may be expected to diminish [the employees'] expectations of privacy in respect of a urinalysis test." *Von Raab*, 109 S.Ct. at 1397 (citation omitted). Each of the above-noted features severely reduces motor vehicle operators' expectations of privacy, and, therefore, mandatory, random urinalysis constitutes only a modest additional privacy intrusion.

We also find significant the fact that employees in each of the three covered positions work in settings other than the "more traditional office environments," *Von Raab*, 109 S.Ct. at 1395, where "drug use is, presumably, more easily detected by means other than urine testing," *Harmon,*

878 F.2d at 488. In short, "[t]he operational realities of the workplace," *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987) (plurality opinion), are such that "a diminished expectation of privacy attaches to information relating to the physical condition of covered employees." *Skinner*, 109 S.Ct. at 1419.

IV.

Apart from their claims of constitutional error, appellants maintain that the District Court erred in granting summary judgment, as there remained outstanding issues of material fact. On appeal from an order granting summary judgment, we review the record *de novo* to determine whether it supports that order. *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1485 (D.C.Cir.1989); *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C.Cir.1988). In the "run-of-the-mill civil case," when the defendant moves for summary judgment, we enquire whether a "fairminded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law, summary judgment shall be granted in its favor. *Id.* at 250, 106 S.Ct. at 2511. *See* FED.R.CIV.P. 56(c).

The Supreme Court has indicated that the allocation of the substantive burden of proof informs our decision on the propriety of the grant of summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *Celotex* instructs that summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, *and on which that party will bear the burden of proof at trial.*" *Id.* at 322, 106 S.Ct. at 2552 (emphasis added) (nonmoving party bore ultimate burden of proof at trial). *See also Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C.Cir.1988) (applying *Celotex*-enunciated

rule where nonmoving party bore initial burden of production, but not burden of proof).

There is surprisingly little authority discussing the allocation of the burden of proof in drug-testing cases. Although neither *Von Raab* nor *Skinner* directly addressed this question, *Von Raab* may hint that the burden rests with the government to prove reasonableness: "[W]e believe that the Government has demonstrated that its compelling interests in safeguarding our borders and the public safety outweigh the privacy expectations" of personnel who interdict illegal drugs and carry firearms. 109 S.Ct. at 1396. Such a conclusion would be consistent with the array of criminal cases placing the burden of demonstrating the lawfulness of a Fourth Amendment encounter on the government. *See, e.g., United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980) (government has burden of proving consent to accompany government agents); *United States v. Carreon*, 872 F.2d 1436, 1441 (10th Cir.1989) ("When a search ... is challenged as violative of the Fourth Amendment, the burden is on the government to prove its validity.") (citations omitted); *United States v. Vega–Barvo*, 729 F.2d 1341, 1349 (11th Cir.1984) (burden on government to prove reasonable suspicion to justify strip search).

On the other hand, in a civil action brought pursuant to 42 U.S.C. § 1983, it appears that the plaintiff shoulders the burden of proving each element essential to his case, including the illegality of the government conduct in question. *See, e.g., Everett v. Napper*, 833 F.2d 1507, 1512–13 & n. 7 (11th Cir.1987) (placing on plaintiff burden of demonstrating unreasonableness of drug-testing scheme); *Kunzelman v. Thompson*, 799 F.2d 1172, 1176 (7th Cir. 1986) (discussing relative burdens in relation to collateral estoppel); *Guenther v. Holmgreen*, 738 F.2d 879, 888 (7th Cir. 1984) (same).[12] By the same token, in the context of the civil forfeiture provisions of the Controlled Substances Act, 21 U.S.C. § 881(d), *where the government is the plaintiff,* it bears the burden of establishing the lawfulness of the Fourth Amendment encounter. *See, e.g., Boas v. Smith*, 786 F.2d 605, 609 (4th Cir.1986) (burden on government to show probable cause to believe that the property is linked to illegal activity); *United States v. United States Currency $31,828*, 760 F.2d 228, 230 (8th Cir.1985) (same).

We need not resolve the question of the allocation of the burden of proving the reasonableness *vel non* of the testing regime, for even if we assume that the burden rests with the government, we conclude that the government established that there is no genuine issue as to any material fact that it must prove at trial and that it is entitled to judgment as a matter of law.

█ Among the issues identified by appellants as material, and therefore preclusive of summary judgment, was the accuracy of the urinalysis testing procedures used by the Department. *See* Statement of Genuine Issues of Material Fact 3, at 1–2, J.A. at 65–66. Inspection of the referenced portions of the record reveals that the parties did in fact disagree over the accuracy of the testing procedures: while the Department contended that the GC/MS technique could be 100% accurate, appellants maintained that testing could produce an error rate of one percent. *See* J.A. at 143; *see also* Reply to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction at 11. While in some contexts such a disagreement might be sufficient to create a triable question of fact, such is not the case here. First, because this is a facial attack on the Department's program, we decide only "whether the tests contemplated by the regulations can *ever* be conducted." *Skinner*, 109 S.Ct. at 1421 n. 10 (citing *Bell v. Wolfish*, 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447 (1979)) (emphasis in original). Furthermore, the facts demonstrate "that the tests at issue

---

**12.** These cases appear fully consistent with the line of cases under section 1983 which place upon the defendant the burden of establishing the *defense* of qualified immunity. *See, e.g.,* *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Martin v. Malhoyt*, 830 F.2d 237, 263 (D.C.Cir.1987).

here are accurate in the overwhelming majority of cases." *Id.* As such, *Skinner* suggests that, even when viewed in the light most favorable to appellants, the facts do not create an issue for trial, and summary judgment was not on this basis improperly granted.

■ Appellants also identified as a genuine issue of material fact the extent of drug use among Department employees. *See* Statement of Genuine Issues of Material Fact B, at 3, J.A. at 67. The referenced portion of the record reveals that the declarant knew of no drug use among the fifteen motor vehicle operators with whom he worked. *See* J.A. at 262. Even if we were to assume that the declaration sufficiently demonstrates a genuine disagreement as to the extent of Departmental-wide drug use, the claim would not create a triable issue of fact. *Von Raab* indicates that a history of intra-agency drug use is not an essential ingredient in establishing the reasonableness of a testing regime. There it was contended that the Customs Service's program was unreasonable because all but a few of the tested employees were entirely innocent of wrongdoing. The Court rejected this claim and concluded instead that "[i]t is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context." 109 S.Ct. at 1395 n. 3.[13]

Appellants have, at least arguably, gone further than respondents in *Von Raab*, arguing that "[t]he government's own documents ... clearly state that the FAA (by far the largest drug testing [Department] component), has a minimal drug 'problem.'" Brief for Appellants at 26. *Cf. Von Raab*, 109 S.Ct. at 1395 (concluding there was little reason to suspect that the Customs Service was "immune" from society's pervasive drug abuse problem). Appellants point to a document issued by the FAA's Director of Aviation, Marine, and Research Programs, which, among other

things, states that "[t]here is no reported evidence that use of drugs has resulted in any safety-related incidents in the FAA," and that "relatively few drug-related incidents of any nature have been recorded." *See* J.A. at 802–03. Viewed in context, the memorandum actually tends to establish the reasonableness of the Department's decision to implement testing.

The FAA document was precipitated by a report issued in 1984 by the Department's Office of Inspector General ("OIG") undertaken "to determine the adequacy of the [FAA's Drug and Alcohol Awareness] program in identifying, referring for treatment, and monitoring FAA personnel with drug, alcohol, and other related problems which may affect their job performance." J.A. at 782. Among the conclusions drawn was that the "FAA has a significant number of employees with drug, alcohol, and other personal problems who have not been identified or tested." *Id.* The OIG also concluded that "FAA does not know the seriousness of the problem or number of employees because it does not have an effective drug and alcohol policy and a strongly endorsed employee assistance program." *Id.* Accordingly, the OIG recommended that the FAA develop and implement a drug screening and testing program. *Id.* at 788.

The FAA's response was mixed. Rather than flatly disputing the OIG's conclusions, the FAA responded that the OIG report was "unbalanced" because it omitted "positive" information and was based on "unsupported data." J.A. at 802. Furthermore, the FAA did not deny that some of its employees might be impaired by drug use; it said only that "[f]or the size of the FAA work force" illicit drug use was "relatively" minimal. *Id.* at 803. Thus, the FAA concluded that the OIG report "would more accurately describe the situation if it was changed from 'The FAA has ...' to 'The FAA may have....'" *Id.* at 802. In light of the sharp increase in the number of Departmental employees entering drug

---

**13.** In light of this conclusion, it is not surprising that in their supplemental briefing appellants abandoned their earlier contention that "[t]he mere assertion of a societal drug problem is not reason enough to abandon" requirement of particularized suspicion. Brief for Appellants at 34.

counseling programs in the years succeeding the OIG Report (from 16 in 1984 to 133 in 1986), many of whom were FAA employees (45 air traffic controllers in one year), J.A. at 765–66, we cannot accept appellants' contention that the Department was acting upon no evidence. From this vantage, far from demonstrating the unreasonableness of the Department's action, the Department's response to the OIG's report is more logically viewed as a hallmark of responsible management.

Appellants also argue that they were wrongly denied a trial because a genuine issue of fact remained as to the correlation between a positive urinalysis test result and current drug impairment. *See* Statement of Genuine Issues of Material Fact C, at 3, J.A. at 67. The materiality of such a fact is established, appellants argue, by the Fourth Amendment's requirement that testing be able to detect only job-impairing drug use.

Although the District Court concluded that the Department "presented proof that drug use, at the level sought by testing generally impairs the normal functioning of employees," *Dole*, 670 F.Supp. at 448, the Department admits that "[t]he district court did overstate the principal thrust" of its evidence. Brief for Appellee at 20. Appellants' first contention—that the judgment of the District Court must be reversed because it accepted a proposition which is scientifically incorrect—overlooks the principle that our review of a grant of summary judgment is *de novo*. Their alternative claim—that the issue of the relationship between off-duty drug usage and on-duty impairment is genuinely disputed and material, and therefore precluded the granting of a motion for summary judgment—while more significant, must also fall.

It should initially be noted that the Department stipulated that urinalysis tests do not necessarily measure actual physical or mental impairment. *See* Defendant's Response to Plaintiffs' Statement of Genuine Issues of Material Fact at 7, J.A. at 74. Thus, we cannot conclude that any factual disagreement precluded summary judg-

ment. Nor can we conclude that summary judgment was improperly granted as a matter of law. As we explained in *Cheney*, the Supreme Court's opinions in *Skinner* and *Von Raab* convince us that the failure of a testing technique to measure actual impairment does not necessarily impugn its legitimacy. *Cheney*, 844 F.2d at 609–610.

In *Skinner*, the Ninth Circuit concluded, as appellants contend herein, that drug testing was constitutionally infirm because of its inability to differentiate drug use that results in on-duty impairment from that which does not. *Railway Labor Executives' Association v. Burnley*, 839 F.2d 575, 588 (9th Cir.1988), *rev'd sub nom. Skinner v. Railway Labor Executives' Association*, — U.S. —, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The Supreme Court rejected this view, in part because it overlooked the principle that relevant evidence need only make a fact of consequence more or less probable, and in part because the regulations "are designed not only to discern impairment but also to deter it." *Skinner*, 109 S.Ct. at 1421.

■ *Von Raab*, where the Court sustained as reasonable the Customs Service's practice of urine testing those whose post-promotion duties would require carrying a firearm, also strongly suggests that the inability of the testing procedures to differentiate on- and off-duty drug impairment is not determinative of the regime's constitutionality. *See Cheney*, 884 F.2d at 609–10. As was true in *Von Raab*, the agency's responsibility to "ensur[e] against the creation of th[e] dangerous risk" posed by drug-using covered employees, 109 S.Ct. at 1393, warrants reasonable measures to detect drug use. Thus, we must reject, as we rejected in *Cheney*, the contention that urinalysis testing is unconstitutional because of its failure to differentiate on- and off-duty drug impairment. 884 F.2d at 609–610. Accordingly, the District Court did not for this reason err in granting the Department's summary judgment motion.

■ Appellants also contend that a trial was necessary to determine whether drug use manifests itself in signs of impairment. *See* Statement of Genuine Issues of Materi-

al Fact 9, at 2, J.A. at 66. Appellants claim that the detectability of impairment is material to the reasonableness of drug testing because it "directly affects the governmental interest portion of the Fourth Amendment." Brief for Appellants at 48. We agree that in certain circumstances the detectability of impairment by means other than urine testing may be a relevant consideration in determining the reasonableness of a drug-testing plan. Thus, the *Von Raab* Court credited the fact that it was "not feasible" to subject interdiction agents or other field employees "to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Von Raab*, 109 S.Ct. at 1395. In *Harmon*, we concluded that the Court viewed employment in a traditional office environment as relevant because in such circumstances "drug use is, presumably, more easily detected by means other than urine testing." *Harmon*, 878 F.2d at 489.

In the context of the present case, appellants have not even argued that it would be practical or feasible to subject covered employees to the sort of day-to-day scrutiny such that testing is unnecessary. We are unable to discern any other materiality in the ascertainment of whether drug users display indicia of impairment. In any event, we could not find that the reasonableness of the Department's plan " 'necessarily or invariably turn[s]' " on the existence of less intrusive alternatives to testing. *See Skinner*, 109 S.Ct. at 1419 n. 9 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983)). In the present case, no less than in *Skinner*, the "insistence on less drastic alternatives would require us to second-guess the reasonable conclusions drawn by the" Department. *Id.* Moreover, employees who are subject to testing in this category "can cause great human loss before any signs of impairment become noticeable to supervisors or others." *See id.* at 1419; *see also supra* note 10 and accompanying text.

In short, appellants have offered no basis on which we can find that summary judgment was improperly granted.

## V.

■■■ As to appellants' statutory claims, we agree with the District Court that they "are not significant." *Dole*, 670 F.Supp. at 447 n. 6. First, appellants contend that the Department's drug-testing program discriminates against "handicapped" persons in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–795i (1982 & Supp. V 1988). The Act protects an "otherwise qualified handicapped individual" from discrimination "solely by reason of his handicap." *Id.* § 794. It should surprise no one, including appellants, that we will not in the context of a facial challenge to the Department's drug-testing program conclude that the District Court erred in not adopting a rationale dependent on the theory that every potential employee testing positive for drug use is an "otherwise qualified handicapped" person. Should a day arise when a handicapped individual within the protection of the Rehabilitation Act is disadvantaged by this program and presents a claim in a concrete factual setting, that will be soon enough to consider the effects of that statute on the provisions of the testing program. *See Doe v. New York Univ.*, 666 F.2d 761, 776–77 (2d Cir. 1981) (concluding that plaintiff must bear the ultimate burden of showing "that in spite of the handicap he is qualified and ... that he is at least as well qualified as other applicants."); *Strathie v. Department of Transp.*, 716 F.2d 227, 230 (3d Cir.1983) (reviewing plaintiff's burden of proof). *See generally, School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 285 n. 14, 107 S.Ct. 1123, 1130 n. 14, 94 L.Ed.2d 307 (1987) (citing with approval *Strathie* and *Doe*).

Appellants' other statutory claim, based on the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* (1982), is hardly more substantial. Appellants argue that the Department acted arbitrarily and capriciously by instituting a drug-testing program that tested for the five above-listed categories of drugs, but not for alcohol, "the drug which is most abused." Brief for Appellants at 45. It has never been the law that the government is forbidden from addressing a problem unless it addresses all other

problems of similar magnitude. *See, e.g., Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). In short, we conclude that the District Court did not err in its summary disposition of the non-constitutional claims.

## VI.

In their facial challenge to the Department's implementation of mandatory, random urine testing, appellants have challenged the program *in toto.* They have specifically called into question the inclusion of only three categories of employees. Although we explicitly requested in our order for supplemental briefing that appellants consider the extent to which the testing of the various job classifications being considered warranted differing treatment than that in *Skinner* and *Von Raab,* appellants did not alter their previous course. We have found the privacy interests of employees occupying the three specifically challenged positions outweighed by the Department's compelling interests in preventing drug use among such personnel. Moreover, we have concluded that the program is supported by sufficiently compelling circumstances to justify the invasions of privacy entailed by conducting such searches without any measure of individualized suspicion. For these reasons, and the others stated above, we hold that the mandatory, suspicionless testing of Category I personnel is reasonable and consistent with the Fourth Amendment, the APA, and the Rehabilitation Act of 1973. Accordingly, the judgment of the District Court is

Affirmed.